ESTATE OF Andrew P. CARTER, Through Its Dative Testamentary Executor, Eugene G. TAGGERT, Etc., Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

No. 90–3099.

United States Court of Appeals, Fifth Circuit.

Jan. 11, 1991.

---

64

John Volz, U.S. Atty., Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., David N. Crapo, Trial Atty., Teresa T. Milton, Gilbert S. Rothenberg, Gary R. Allen, Chief, Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellant.

Kenneth Paul Carter, Monroe & Lemann, New Orleans, La., for plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before POLITZ, WILLIAMS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this case, we must determine how to value, for purposes of the estate tax credit

available under 26 U.S.C. § 2013, a usufruct[1] transferred between persons killed in a common disaster. The taxpayer asserts that the usufruct should be valued in accordance with actuarial tables reflecting the expected lifespan of the transferee. Emphasizing the imminence of the transferee's death at the time he received the usufruct, the government contends that the property interest was worthless. We conclude that a usufruct passed between persons dying in a common disaster has no value and thus that the taxpayer is entitled to no credit. Accordingly, the district court's judgment is reversed.

I.

An automobile accident claimed the lives of Andrew Carter and his wife Josephine. Because no evidence indicated who had died first or whether their deaths were simultaneous, a presumption arose under Louisiana law that Mrs. Carter died first.[2] Mrs. Carter's will granted her estate in usufruct to Mr. Carter and in naked ownership[3] to the couple's surviving children. Because of the temporal proximity of their deaths, the period of Mr. Carter's usufruct was of exceedingly short duration—if it in fact ever existed.

II.

After the executor of Mr. Carter's estate paid the federal estate tax, he filed a claim for a refund, alleging entitlement to a "tax on prior transfer" (hereinafter TPT) credit under section 2013 of the Internal Revenue Code of 1986, 26 U.S.C. § 2013 (1989). Section 2013(a) reduces a decedent's estate tax by "all or part of the amount of the Federal estate tax paid with respect to the transfer of property ... to the decedent by or from a person ... who died within 10 years before, or within 2 years after, the dece-

---

**1.** Louisiana law defines a usufruct as "a real right of limited duration on the property of another." La.Civ.Code art. 535. It is comparable to the common law life estate. *Land v. United States*, 565 F.2d 355, 356 (5th Cir.1978) (per curiam).

**2.** La.Civ.Code art. 938 provides in pertinent part, "If those who have perished together ... were above the age of sixty years, the youngest

shall be presumed to have survived." Although both Mr. and Mrs. Carter were 67 years of age at the time of their deaths, Mr. Carter was younger by a few months.

**3.** Louisiana law provides that "[t]ag ownership of a thing burdened with a usufruct is designated as naked ownership." La.Civ.Code Art. 478 (1980). Accordingly, naked ownership is analogous to ownership of a vested remainder under the common law.

dent's death." The TPT credit "bears the same ratio to the estate tax paid ... with respect to the estate of the transferor as the value of the property transferred bears to the taxable estate of the transferor...." *Id.* § 2013(b).

The credit amount is thus calculated according to the following formula:

$$\frac{\text{TPT credit}}{\text{transferor tax paid}} = \frac{\text{value of property transferred}}{\text{taxable estate of transferor}}$$

Applying the formula to our facts, the TPT credit bears the same ratio to the tax paid by Mrs. Carter's estate as the value of the usufruct bears to the value of Mrs. Carter's taxable estate.

The value of the property transferred (here, the usufruct) is thus critical in calculating the TPT credit. The taxpayer urged the district court to consult the actuarial tables contained in the applicable Internal Revenue Service regulations and accordingly to conclude that the value of the usufruct transferred from Mrs. Carter to Mr. Carter was approximately $1 million. Inserting this amount into the above formula would yield a credit of $292,450.56.

In contrast, the government asserted that when a transferor and transferee die in a common disaster, a usufruct passing between them is valueless. According to the formula, the TPT credit thus would be zero.

Concluding that "no one knew or could have known whether Mr. Carter would survive or not, or how long" at the time he received the usufruct, the court consulted the actuarial tables to value the transferred property.[4] As a consequence, the court granted the taxpayer's motion for summary judgment and awarded the requested refund.

### III.

#### A.

■ In reviewing the disposition of a summary judgment motion, we apply the same Fed.R.Civ.P. 56(c) test as did the district court, without deference to its ultimate conclusion. *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir.1987), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1988). Rule 56(c) permits summary judgment where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The parties stipulated to all relevant facts, and the court, interpreting the pertinent provisions of the code and their accompanying regulations, concluded that the taxpayer was entitled to judgment as a matter of law. We review *de novo* the district court's judgment.

#### B.

■ Section 2013(d) states that "[t]he value of property transferred to the decedent shall be the value used for the purpose of determining the Federal estate tax liability of the estate of the transfer-

---

**4.** The taxpayer seizes on the quoted statement in attempting to protect this judgment from *de novo* review. The estate characterizes the declaration as a "finding of fact" subject to reversal only if clearly erroneous. This approach is unavailing. Since the parties stipulated to the relevant facts, the district court did not make any factual findings entitled to deference on appeal. The court's statement did not amount to a finding of fact but rather was a reason in support of its legal conclusion.

The taxpayer commits a similar error in its treatment of *Estate of Wien v. Commissioner,* 441 F.2d 32 (5th Cir.1971). In that case, we interpreted entirely different valuation regulations and concluded that ownership interests in life insurance policies should have been valued in accordance with procedures outlined in the applicable regulations. In the course of our opinion, we stated that "in the present case, at the moment of Mrs. Wien's death, no one knew or could have known whether Mr. Wien would survive or not." *Id.* at 40. The taxpayer attempts to characterize this as a statement that we are bound to apply in all cases.

We do not read *Wien* so broadly. *Wien* undoubtedly stands for the proposition that in a simultaneous death situation the valuation of ownership interests in life insurance policies must be based upon the interpolated terminal reserve of the policy. However, the court's observation, quoted above, is not a holding that binds us in a non-insurance case.

or...." The accompanying regulations reiterate this language. *See* 26 C.F.R. § 20.2013-4(a) (1988). However, the regulations set up a specific valuation rule for indeterminate interests such as usufructs:

> If the decedent received a life estate or remainder or other limited interests in property included in the transferor's gross estate, the value of the interest is determined as of the date of the transferor's death on the basis of recognized valuation principles (see especially §§ 20.2031-7 and 20.2031-10).

*Id.*

Sections 20.2031-7 and 20.2031-10, to which section 20.2013-4(a) refers, contain actuarial tables by which the value of indeterminate interests may be determined. However, section 20.2013-4(a)'s inclusion of the phrase "see especially §§ 20.2031-7 and 20.2031-10" plainly indicates that "recognized valuation principles" *include* but are not *limited to* the use of actuarial tables.[5] Accordingly, neither the statutory nor regulatory language mandates using the actuarial tables in every case.[6]

Unfortunately, this regulation does not identify any "recognized valuation principles" other than the actuarial tables, nor does it indicate when such alternative methods should be used. However, precedents of this court and others indicate that consideration of facts known at the time of the transferor's death (i.e., at the time of the transfer) is a "recognized valuation principle"[7] and that this case presents a situation in which that method should have been employed by the district court.

For example, in *Lion*, a case identical in all relevant respects to this one, the Fourth

---

5. In *Estate of Lion v. Commissioner*, 438 F.2d 56, 60 (4th Cir.1971), the court declared as follows: "That the tables may or may not reflect 'recognized valuation principles' is implicit in the use of the phrase 'see especially § 20.2031-7' (emphasis added), rather than an imperative phrase, for example, 'as determined by § 20.2031-7,' or an expression of like import. The regulations thus leave room for departure from strict application of the tables." The court further stated that recognized valuation principles "may be, but not necessarily are, to employ actuarial and mortality tables." *Id.* at 61.

In applying a similar set of valuation regulations, we stated that "the exclusive use of the mortality tables is not required under all circumstances." *Miami Beach First Nat'l Bank v. United States*, 443 F.2d 116, 120 (5th Cir.1971). We reached this conclusion in the face of arguably less flexible regulations. In the instant case and in *Lion*, the regulation at issue stated that valuations should be made in accordance with "recognized valuation principles," a somewhat amorphous term capable of broad interpretation. In *Miami Beach*, by way of contrast, we interpreted 26 C.F.R. § 20.2031-7(a), which currently states that "[t]he present value of [indeterminate interests] is computed by the use of Table A in paragraph (f) of this section." Our conclusion that "recognized valuation principles" include more than actuarial tables should be entirely unstartling, especially in light of our conclusion in *Miami Beach*.

6. The taxpayer concedes, as it must, that "recognized valuation principles" does not refer exclusively to the actuarial tables. However, it makes the novel argument that the phrase refers solely to the valuation methods in 26 C.F.R. §§ 20.2031-1 through 20.2031-10. The taxpayer offers this assertion in order to argue ultimately that the actuarial tables *must* be used whenever they *can* be used.

The taxpayer erects an elaborate *in pari materia* interpretation of the valuation regulations that rests upon a shaky foundation. The taxpayer's entire argument in this regard depends upon its initial assumption that the phrase "recognized valuation principles" refers exclusively to §§ 20.2031-1 through 20.2031-10, but the taxpayer offers absolutely no basis upon which such an assumption could be made. In light of both those cases in which the phrase "recognized valuation principles" has been interpreted to include consideration of known facts, *see, e.g., Lion* (specifically interpreting section 20.-2013-4(a)'s language), and those in which known facts have been considered, *see, e.g., United States v. Provident Trust Co.*, 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793 (1934), the taxpayer's argument is unavailing.

Furthermore, had the regulation's drafters intended "recognized valuation principles" to refer exclusively to §§ 20.2031-1 through 20.2031-10, they easily could have crafted the regulation to reflect such an intent. That they did not is evidence that "recognized valuation principles" goes beyond the valuation methods set forth in those sections. In short, then, because the foundation of the taxpayer's argument does not withstand scrutiny, neither does the argument as a whole.

7. *See Provident Trust; Miami Beach*, 443 F.2d at 119-20; *Estate of Marks v. Commissioner*, 94 T.C. 720 (1990); *Lion*, 438 F.2d at 62; *Estate of Fabric*, 83 T.C. 932, 943 (1984); *Estate of Hoelzel*, 28 T.C. 384 (1957); *Estate of Butler v. Commissioner*, 18 T.C. 914 (1952); *Estate of Jennings v. Commissioner*, 10 T.C. 323 (1948).

Circuit held that the district court properly considered the simultaneous deaths of the transferor and transferee and concluded that this fact rendered the transferee's life estate worthless for purposes of the TPT credit. 438 F.2d at 62. The court observed that "[w]hile the regulations indicate that *ordinarily* the value of a life estate is to be determined by the use of actuarial tables, the use of tables is subject to the underlying premise that what is sought to be achieved is value 'as of the date of the transferor's death on the basis of recognized valuation principles.' " *Id.* at 60 (emphasis in original).

Similarly, in *United States v. Provident Trust Co.*, 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793 (1934), the Court held that in determining the value of a charitable remainder contingent upon the life tenant's not having any issue, the fact that the life tenant had undergone a hysterectomy could be considered. Furthermore, in *Miami Beach* we held that in determining the value of charitable remainders, "evidence regarding the actual life expectancy of a life tenant" may be considered. 443 F.2d at 119.[8] Thus, the phrase "recognized valuation principles" includes examination of facts known about the transferee at the time of the transferor's death.

Nonetheless, simply because an alternative valuation principle exists does not necessarily mean that it should be employed in this case. However, relevant caselaw indicates that this approach to valuation may be employed in exceptional situations. For example, in *Lion* the court observed that "unusual circumstances" have prompted courts to eschew mortality tables in favor of examining known facts when determining the value of indeterminate interests. 438 F.2d at 60.

The *Lion* court further noted that numerous Tax Court decisions have employed alternative valuation methods "where there is reasonable certainty that use of the tables would violate reason and fact." *Id.* at 61 (citations omitted). We held similarly in

*Miami Beach* that employing valuation procedures other than actuarial tables should occur in "exceptional cases." 443 F.2d at 120 (citation omitted).

The paradigm "unusual circumstance" in which mortality tables have not been employed is the simultaneous death of the transferor and transferee. In *Lion*, the court observed that the transferee and transferor died at the same time and held that "the only reasonable conclusion is that [the] life estate was valueless at the instant of its creation and destruction." 438 F.2d at 62. *See also Estate of Marks v. Commissioner*, 94 T.C. 720 (1990). That same exceptional situation exists in this case, and we agree with the Fourth Circuit's conclusion.

The taxpayer seeks to avoid application of this alternative recognized valuation principle by arguing that it was not "known" at the time of Mrs. Carter's death that Mr. Carter would die. It analogizes this case to *Ithaca Trust Co. v. United States*, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), in which the Court held that in determining the value of a life estate, the fact that the life tenant died six months after receiving the property should not be considered.

This case is unlike *Ithaca Trust*. In this case, it was known at the time of the transfer that Mr. Carter was already dead or would soon die. At the moment of Mrs. Carter's death, Mr. Carter's death was not an "uncertain probability," as was the death in *Ithaca Trust*, where the life tenant died six months after the transfer. In fact, it is only by operation of the fiction established by state law (article 938) that we deem Mr. Carter to have survived Mrs. Carter for a few seconds or minutes. The truth—which will never be known—could just as likely be that he predeceased her or that they died simultaneously.

The taxpayer further contends that policy considerations mandate application of the actuarial tables. It argues that the tables contemplate situations in which the holder of the usufruct dies much sooner

---

8. In *Miami Beach* we ultimately held that the mortality tables should have been employed because the evidence did not demonstrate that the

life tenant's death was imminent. 443 F.2d at 120.

than expected and that thus the tables should be applied in all circumstances. Although there is some merit to this argument, it ignores the fact that our task is to interpret the language of the regulation.

Section 20.2013–4(a) demands that we value the usufruct in accordance with "recognized valuation principles"; this language indicates that there are situations in which the value of the interest is calculated not by resort to the tables, but instead according to some other method. Taking the taxpayer's policy argument to its logical conclusion would require our applying the tables in every case, something plainly not contemplated by the regulation.

Here, we opt instead to apply the maxim that certainty should be deemed a "recognized valuation principle." Just as it would be foolish to "predict" yesterday's weather, there is no reason to use uncertain valuation principles—regardless of how sophisticated—to "value" something for which a value in fact already has been indelibly fixed by the course of events.

The taxpayer also argues that applying the tables in all cases would promote the regulatory goals of ease and uniformity. Although this is certainly true, we fail to see how our conclusion undermines those goals. We limit our holding to those situations in which the transferee and transferor of an indeterminate interest such as a usufruct die in a common disaster. Because in this situation it is known with certainty that the transferee will die (or in fact may already have died), there is no need for inquiries into just how much the particular decedent's lifespan varies from the statistical norm, and thus valuation of this variety of property interest will not be unduly complicated.

## IV.

Because the district court failed to employ the recognized valuation principle appropriate to this case, we REVERSE its judgment and RENDER judgment in the government's favor.