**TEXAS AMERICAN BANCSHARES, INC., et al., Plaintiffs–Appellees,**

v.

**Robert Logan CLARKE, The Comptroller of the Currency, et al., Defendants,**

**Federal Deposit Insurance Corporation, Defendant–Appellant.**

No. 90–1674.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1992.

John L. Rogers, III, Hopkins & Sutter, Chicago, Ill., Robert F. Reklaitis, Hopkins & Sutter, Richard J. Osterman, Jr., Sharon P. Sivertsen, Colleen B. Bombardier, Robert G. Clark, Washington, D.C., for FDIC.

Marvin S. Sloman, Peter Tierney, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., Bruce E. Clark, Patricia A. Connell, Mark V. Holmes, Tariq Mundiya, Sullivan & Cromwell, New York City, for plaintiffs-appellees.

Thomas W. Luce, III, Kim J. Askew, R. Doak Bishop, Jeffrey C. King, Hughes & Luce, Dallas, Tex., John D. Hawke, Jr., Howard N. Cayne, Arnold & Porter, Washington, D.C., for amicus curiae, MCorp, MCorp Financial, Inc. and MBank New Brunfels, N.A.

Before POLITZ, Chief Judge, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is a suit by a bank holding company and some of its subsidiary banks against the Federal Deposit Insurance Corporation (FDIC), both in its corporate capacity and as receiver of the holding company's insolvent lead bank, challenging the FDIC's structuring of a purchase and assumption transaction of the failed lead bank in such a way that some lead bank creditors receive one hundred percent of the sums owed them, while certain affiliated creditors, including plaintiffs, receive only what they would have received if the lead bank had instead been liquidated. All of the parties below moved for summary judg-

ment on the basis of stipulated facts. The district court granted the motion of the plaintiffs-appellees and entered judgment against the FDIC in the agreed upon, liquidated amount of $5 million. 740 F.Supp. 1243. The FDIC brings this appeal. We hold that under the stipulated facts the FDIC is not shown to have violated any requirement of law in its structuring of the instant purchase and assumption agreement in this fashion. We accordingly reverse.

### Facts and Proceedings Below

Plaintiff-appellee Texas American Bancshares, Inc. (TAB) is a Texas corporation and registered bank holding company. In July 1989, it was the sole owner of twenty-two national banks located in Texas and of two Texas state banks. The deposits of each of these twenty-four banks were insured by the FDIC. In May 1989, the TAB subsidiary banks had assets of almost $5 billion. Of these subsidiary banks, the lead bank, TAB Fort Worth, was a national bank located in Fort Worth that had over forty-six percent of the total assets of all the TAB subsidiary banks as of December 1988. During the period at issue, July 1989, TAB Fort Worth had outstanding obligations to the other TAB subsidiary banks of over $800 million in the form of federal funds, certificates of deposit, and other deposit obligations. Over $675 million of these obligations were in the form of federal funds purchased from other TAB subsidiary banks.

The financial condition of TAB Fort Worth began to deteriorate in 1988. In an attempt to prevent further financial decline, TAB began discussions with National Bancshares Corp. (NBC), another bank holding company experiencing financial difficulties, about formulating a restructuring, involving recapitalization by an outside private investor and assistance by the FDIC. The FDIC solicited proposals, and

in July of 1988 announced that it had accepted a conditional proposal regarding TAB and NBC. The transaction, however, fell through. Later that year, in October 1988, the FDIC announced that it had reopened the bidding process for a consolidated purchase and assumption of TAB and NBC by outside private investors. Neither TAB nor its subsidiaries participated in the bidding or negotiations. The financial decline of TAB continued throughout the last quarter of 1988 and the first two quarters of 1989. In response, the FDIC initiated the process to form a bridge bank in March 1989. On June 9, 1989, a private investor, Ronald Steinhart, submitted a proposal to acquire all of the TAB banks on behalf of Deposit Guaranty Bank. On July 18, 1989, the FDIC formally accepted and approved the Steinhart proposal. On July 20, 1989, the Comptroller of the Currency (the Comptroller) declared TAB Fort Worth insolvent. The FDIC was appointed as its receiver. On the same day, the Comptroller granted the bridge bank a charter under the name of Texas American Bridge Bank, N.A. (Bridge Bank).

As receiver of TAB Fort Worth, the FDIC (FDIC Receiver) entered a Purchase and Assumption Agreement with the Bridge Bank and a Contract of Sale with the FDIC in its corporate capacity (FDIC Corporate).[1] After these transactions were approved by a federal district court, FDIC Receiver transferred most of the assets of TAB Fort Worth to the Bridge Bank, and the latter assumed most of TAB Fort Worth's obligations. Specifically not included in the obligations assumed by the Bridge Bank, however, were those for the federal funds sold to TAB Fort Worth by other TAB subsidiary banks and the certificates of deposit other TAB subsidiaries had purchased from TAB Fort Worth, the face amounts of all of which totalled over $800 million.

---

**1.** The Contract of Sale provided that FDIC Corporate would receive certain assets of TAB Fort Worth not transferred to the Bridge Bank and in exchange would provide FDIC Receiver sufficient funds to pay all TAB Fort Worth liabilities not assumed by the Bridge Bank. Such liabilities would be paid on a pro rata basis, calculated on the aggregate fair market value of the assets of TAB Fort Worth, together with interest. FDIC Corporate also entered an Indemnity Agreement with the Bridge Bank.

The FDIC contemporaneously notified the Comptroller that the other TAB subsidiary banks would receive from the TAB Fort Worth receivership only sixty-seven percent of the face amount of obligations owed them by TAB Fort Worth. The Comptroller, in response, determined on July 20, 1989, that because of such valuation, all of the other TAB subsidiary national banks were insolvent, ordered them closed, and appointed the FDIC as receiver for each.[2] The FDIC then arranged coordinated purchase and assumption transactions for each of the twenty-three remaining subsidiary banks on similar terms, with the same, single ultimate purchaser as for TAB Fort Worth. FDIC Corporate, to facilitate this purchase and assumption of the entire TAB system, provided approximately $250 million in operating funds and related costs to the Bridge Bank. Bridge Bank agreed to pay to FDIC Receiver any excess of the value ultimately realized from the assets transferred to it by FDIC Receiver over the amount necessary to pay the assumed liabilities and to reimburse FDIC Corporate for the referenced operating funds and related costs advanced it by FDIC Corporate. Bridge Bank's successor in interest, Deposit Guaranty Bank, contributed approximately $175 million in capital pursuant to the agreement. FDIC Corporate has also since provided direct assistance of approximately $900 million to Deposit Guaranty Bank to permit Deposit Guaranty Bank to assume the liabilities of TAB Fort Worth (and the other TAB subsidiary banks), which were assumed by Bridge Bank. This $900 million is essentially the shortfall between the assets and liabilities of TAB Fort Worth (and the other TAB subsidiary banks), which were transferred to and assumed by Bridge Bank.

The parties agree that if the federal funds sold to and certificates of deposit purchased from TAB Fort Worth by thirteen of the other TAB subsidiaries had been assumed or paid in full, the Comptroller (the Texas Banking Commissioner in the case of the two state banks) would not have declared them insolvent and closed them.[3] These thirteen subsidiaries, plus TAB itself (their sole shareholder), are the plaintiffs-appellees in this suit. The parties have also stipulated that if TAB Fort Worth had been liquidated, its creditors would have received not more than sixty-seven cents on the dollar.

On July 20, 1989, these thirteen TAB subsidiary banks (plaintiff TAB banks) initiated this suit, moving for a temporary restraining order in the United States District Court for the Northern District of Texas, Dallas division. The district court denied that request on July 21, 1989. The parties agreed to allow the sale of the TAB system to proceed and submitted the case for disposition on cross-motions for summary judgment and stipulated facts. The parties also agreed that if judgment were rendered in favor of TAB, the FDIC would pay it liquidated damages in the total amount of $5 million in lieu of any other recovery by plaintiffs. The district court granted summary judgment for TAB, and entered final judgment in its favor, and against FDIC Corporate and FDIC Receiver, in the total amount of $5 million and costs of court, and denied all other relief. The FDIC, in both capacities, appeals to this Court.

2. The two TAB state bank subsidiaries were closed in a similar fashion. On July 20, 1989, the Comptroller informed the Texas Banking Commissioner that TAB Fort Worth had been closed and that the TAB state banks would receive only sixty-seven percent of the face value of the obligations owed them by TAB Fort Worth. The Texas Banking Commissioner responded by declaring the TAB state banks insolvent and ordering them closed. The FDIC was then appointed receiver of the two state banks.

3. These thirteen subsidiary TAB banks are eleven of the national banks (those located in Amarillo, Tyler, Duncanville, Fredericksburg, Midland, Dennison, Richardson, Farmer's Branch, Wichita Falls, Forum, and Temple) and the two state banks (located in Grand Prairie and Levelland). The remaining ten of the other TAB subsidiary banks (TAB Austin, TAB Breckenridge, TAB Dallas, TAB Prestonwood, TAB LBJ, TAB Galleria, TAB Southwest, TAB Longview, TAB McKinney, and TAB Plano) would all have been insolvent even if TAB Fort Worth's indebtedness to them had been paid in full.

Today, the former TAB banks have been returned to private ownership, and each is providing services to the community under the name of TEAM Bank.

### Discussion

### I. Background: Purchase and Assumption Transactions

This controversy arises in a context presenting an all too familiar scenario: the insolvency and subsequent closing by the FDIC of a large federally insured bank. Congress created the FDIC during another era of banking crisis to promote stability and maintain confidence in the national banking system. To this end, the FDIC as insurer of bank deposits pays depositors to the extent of insurance coverage when an insured bank fails. *See* 12 U.S.C. § 1821. In fulfilling this duty to pay depositors, the FDIC has two primary alternatives: liquidation or a purchase and assumption.[4]

A liquidation involves closing the insolvent bank, selling its assets, paying depositors their insured amounts, and covering any shortfall with insurance funds. Liquidations may have substantial disadvantages: "[a]ccounts are frozen, checks are returned unpaid, and a significant disruption of the intricate financial machinery results." *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.1982), *cert. denied* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). The probability that uninsured deposits or liabilities will be paid in any substantial part is slight, and the cost to the FDIC of simply covering insured funds is great. *See FDIC v. Merchants Nat'l Bank*, 725 F.2d 634, 636–37 (11th Cir.), *cert. denied* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984). Additionally, closed banks erode confidence in the nation's banking system. *Id.*

■ In contrast, a purchase and assumption transaction has sometimes been found to be "a dramatically effective and cost-efficient way to protect depositors, the banking system, and the resources of the insurance fund." *Federal Deposit Ins. Corp. v. Bank of Boulder*, 865 F.2d 1134, 1136 (10th Cir.1988). As in a liquidation, the FDIC is appointed receiver of the failed bank. However, instead of closing the institution, FDIC Receiver sells most of the assets and liabilities of the failed bank to a bridge bank.[5] The bridge bank opens the next day with no interruption of banking services or loss to depositors.

If the liabilities assumed by the bridge bank exceed the assets acquired, the FDIC (in its corporate capacity) pays the bridge bank the difference in a cash payment. The cash is obtained from the FDIC's insurance fund, and in exchange the FDIC (in its corporate capacity) acquires the untransferred, unassumed assets of the failed bank. In addition to providing the cash needed to entice a purchaser to buy the failed bank, the FDIC (in its corporate capacity) also provides the bridge bank with cash for operating expenses.

With one exception, the FDIC has almost complete discretion to undertake a purchase and assumption of the failed institution instead of a liquidation. The FDIC must determine that the purchase and assumption will be less costly than liquidating the bank. *See* 12 U.S.C. § 1823(c)(4)(A).

An appropriate purchase and assumption transaction is a symbiotic relationship for all involved: "The FDIC minimizes its loss, the purchasing bank receives a new invest-

---

**4.** For a general discussion of purchase and assumption transactions, see Note, *Unsecured Creditors of Failed Banks: It's Not a Wonderful Life,* 104 Harv.L.Rev. 1052, 1054–56 (1991).

**5.** A bridge bank is a chartered bank that exists for a limited time to effectuate these purchase and assumption transactions. *See* 12 U.S.C. § 1821(n). The bridge bank is authorized to assume deposits or other liabilities and/or purchase assets of the insured bank. *Id.* § 1821(n)(1)(B). The FDIC may provide operat-

ing funds or assistance to the bridge bank. *Id.* § 1821(n)(5) & (7). The bridge bank terminates on the earliest of the following events: the passage of two years after the bridge bank was given a charter; the merger of the bridge bank with another bank; the sale of the stock of the bridge bank to another entity; or the assumption of substantially all of the deposits and other liabilities of the bridge bank by another bank. *Id.* § 1821(n)(10).

ment and expansion opportunity at low risk, and the depositors of the failed bank are protected from the vagaries of the closing and liquidation procedure." *Gunter,* 674 F.2d at 866.

In a case of first impression in this Circuit, this Court is now called upon to determine whether structuring a purchase and assumption agreement in such a way that creditors closely affiliated with the insolvent bank receive only the liquidation value of their claims while unaffiliated creditors receive one hundred percent violates the provisions of the National Banking Act.

## II.

### A. Standard of Review

■ The district court entered summary judgment in favor of TAB on the basis of stipulated facts. The sole issue on appeal is whether the FDIC complied with its statutory duty as receiver to make ratable dividends of the proceeds of TAB Fort Worth's assets. The question of whether the FDIC has the authority to structure a purchase and assumption agreement so that unaffiliated creditors receive one hundred percent while affiliated creditors receive only liquidation value is a question of law that we review *de novo. See, e.g., Estate of Carter through Taggart v. United States,* 921 F.2d 63, 65 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 73, 116 L.Ed.2d 47 (1991); *Abdulla Fouad & Sons v. FDIC,* 898 F.2d 482, 483 (5th Cir. 1990); *cf. Federal Deposit Ins. Corp. v. Bank of Boulder,* 911 F.2d 1466, 1469 (10th Cir.1990) (determining that the question of whether the FDIC has statutory authority

to purchase a letter of credit in a purchase and assumption agreement is a question of law), *cert. denied,* — U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991).

### B. The National Banking Act

■ At issue here is whether the FDIC violated sections 91 and 194 of the National Banking Act (NBA), which impose on a national bank receiver the duty to make ratable dividends and avoid preferences, by structuring a purchase and assumption transaction in such a way that unaffiliated creditors received one hundred percent of their claims while affiliated creditors received only liquidation value.[6]

### 1. The statutory scheme

The NBA allows the Comptroller, on becoming satisfied that a bank is in default, to appoint "a receiver" who

"shall take possession of the books, records, and assets ..., collect all debts, dues, and claims belonging to it, and upon the order of a court ..., may sell all the real and personal property of such association, on such terms as the court shall direct. Such receiver shall pay over all money so made to the Treasurer of the United States, subject to order of the Comptroller,...." 12 U.S.C. § 192.

Section 194 provides that:

"From time to time, ..., the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction ..." 12 U.S.C. § 194.

---

6. The FDIC urges that their actions in structuring the purchase and assumption of TAB Fort Worth are nonreviewable as "agency ... action committed to agency discretion by law" under the Administrative Procedure Act, because the Federal Deposit Insurance Act gives the FDIC "sole discretion" to make loans to, purchase the assets, or assume the liabilities, of any insured depository institution. *See* 5 U.S.C. § 701(a)(2); 12 U.S.C. § 1823(c)(1). We reject this contention and proceed to consider the substantive issues of the case. The only issue presented on appeal before this Court is whether the structure of the distributions to creditors organized by the FDIC is prohibited by the NBA. We disagree

with the FDIC's argument that the broad grant of discretion in section 1823 of the Federal Deposit Insurance Act gives the FDIC discretion to violate sections 91 and 194 of the NBA, which impose duties to make ratable dividends and avoid preferring some creditors over others. We also note that our holding in this case, that the FDIC is not shown to have violated sections 91 and 194, is limited to a review of the FDIC's compliance with the ratability requirement, and does not constitute a review of the FDIC's actions in making contributions from the insurance fund or otherwise structuring the purchase and assumption.

Section 91 continues the proscription against unequal distributions by invalidating preferences:

"All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit ... made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, ... shall be utterly null and void." 12 U.S.C. § 91.

While these provisions of the NBA are not expressly made applicable to the FDIC, they must be read in light of the entire statutory scheme. Section 1821(c)(2)(A)(ii) of the Federal Deposit Insurance Act requires that the FDIC be appointed receiver "whenever a receiver is appointed for the purpose of liquidation or winding up" an insured national bank. 12 U.S.C. § 1821(c)(2)(A)(ii). Thus, whenever the FDIC acts as receiver and liquidates a failed national bank, it acts subject to the requirements in sections 91 and 194 of the NBA.

TAB contends that the FDIC's sale of TAB Fort Worth to an outside investor in a purchase and assumption generated proceeds that the FDIC was required to distribute equally to all TAB Fort Worth creditors. They further argue that the FDIC's paying the other TAB subsidiary banks only sixty-seven percent of their obligations while paying other creditors one hundred percent of their obligations is not a ratable dividend and in fact constitutes a preference of some creditors over others, thus violating both sections 91 and 194.

■ This interpretation of sections 91 and 194 misconstrues two aspects of the transaction at issue here. First, TAB misconceives what the requirement of ratability applies to: creditors need only be paid a pro rata share of their claims out of the assets of the failed bank. The statute requires the Comptroller to make a "ratable dividend *of the money so paid over to him by such receiver.*" 12 U.S.C. § 194 (em-

phasis added). The statute continues and clarifies that by "money so paid over to him by such receiver" is meant "the proceeds of the assets of such association." *Id.* The statute does impose a requirement of ratable payments to creditors, but only to the extent of the assets of the failed bank. The parties stipulated that if the TAB banks had been liquidated, the proceeds generated would have been sufficient to pay creditors no more than sixty-seven cents on the dollar. Thus, the plaintiff TAB subsidiaries, in receiving sixty-seven percent of their claims, did receive a ratable distribution of the proceeds of the assets of TAB Fort Worth.

■ The plaintiff-appellees' interpretation also ignores the dual role that the FDIC played in the purchase and assumption of TAB Fort Worth. The FDIC acted not only as receiver of TAB Fort Worth, but also in its corporate capacity. The separateness of these dual identities of the FDIC has been well respected by federal courts. *See Federal Deposit Ins. Corp. v. Condit,* 861 F.2d 853, 856 (5th Cir.1988); *Federal Deposit Ins. Corp. v. Hatmaker,* 756 F.2d 34, 36 n. 2 (6th Cir.1985); *Gunter,* 674 F.2d at 873–74. The FDIC as receiver of TAB Fort Worth sold nearly all the assets of TAB Fort Worth to the Bridge Bank. The FDIC in its corporate capacity provided operating funds to the Bridge Bank, injected $900 million from the insurance fund so that nonaffiliated creditors could be paid 100% of their claims instead of only the 67% pro rata share to which they were entitled, and entered an indemnification agreement with the Bridge Bank. While the NBA does require that the FDIC as receiver distribute the proceeds of the assets of the failed bank ratably, there is no requirement imposed on the FDIC in its corporate capacity that distributions from the insurance fund must be paid ratably. *See* 12 U.S.C. § 1823(c) (giving the FDIC "sole discretion" to make contributions to an insured bank). Indeed, the only obligation in this respect imposed on the FDIC in its corporate capacity is to compensate insured depositors fully. Thus, the plaintiffs TAB banks and TAB have no claim to

a pro rata share of the contribution from the insurance fund, nor can they force the FDIC to provide them with matching distributions from the insurance fund.[7]

Plaintiffs-appellees urge, however, that the $900 million in direct assistance provided by the FDIC in its corporate capacity was consideration for the purchase and assumption transaction, and thus was (or was in large part) proceeds of TAB Fort Worth's assets that must be distributed ratably. We find this proposition to be factually inaccurate. As consideration for the assets not transferred to the Bridge Bank, FDIC Corporate provided FDIC Receiver with funds sufficient to pay those creditors of TAB Fort Worth whose liabilities were not assumed in the purchase and assumption a pro rata share of the assets of TAB Fort Worth. The $900 million FDIC Corporate paid to the assuming bank constituted simply direct assistance payments from the insurance fund for which the FDIC, Receiver or Corporate, received nothing in exchange. To treat these direct payments as some type of consideration or return for the assets of TAB Fort Worth is to ignore the fact that these payments were necessary because the transferred assets of TAB Fort Worth (and the other TAB subsidiary banks) were less than the assumed liabilities by $900 million.[8]

### 2. Case law interpreting the NBA

Very little case law exists interpreting these provisions of the NBA. The Supreme Court first spoke in this area in *White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884). *White* involved the failure of Miners' National Bank in 1875. The Comptroller refused to allow White's claim, and White brought a mandamus action against the Comptroller. In 1883, White recovered a judgment against the bank in the amount of his claim plus interest from the date the claim had been denied. During the intervening eight years, the Comptroller had made dividends to other creditors amounting to sixty-five percent of their claims. The Comptroller then made a payment to White in the amount of sixty-five percent of his original claim, excluding interest. White sued, claiming he was entitled to sixty-five percent of his judgment, which included interest from the date his claim had been denied. The Supreme Court affirmed the action of the Comptroller. The Court explained the statutory proscription that dividends be paid ratably as requiring dividends to be made "by some uniform rule" and noted that "[a]ll creditors are to be treated alike." *White*, 4 S.Ct. at 686–87. The Court held that it was the comptroller's duty "in paying dividends, to take the value of the claim at that time as the basis of distribution." *Id.* at 687. *White*, with its emphasis on payments to creditors from the assets of the bank as of the date of insolvency, bolsters our conclusion that the FDIC did not violate its duty to distribute dividends ratably. The explanatory language that all creditors be treated alike does not, as plaintiffs-ap-

---

**7.** The Harvard Note reaches the same conclusion by analyzing several differences between liquidations and purchase and assumption transactions. The author concludes that:

"Unassumed creditors [in a purchase and assumption] should not receive an amount equal to the assumed creditors, because only insured depositors are legally entitled to full compensation. As long as unassumed creditors receive the amount they would have received in a liquidation, the enhanced distribution that their assumed counterparts receive comes from deposit insurance funds, not the receivership estate, and should not violate the NBA's equal treatment rule." Note, 104 Harv. L.Rev. at 1067.

**8.** With respect to the $250 million, as noted, Bridge Bank, and its successor Deposit Guaranty Bank, were obligated to pay to FDIC Receiver

(and thus make available pro rata to plaintiffs as creditors of TAB Fort Worth) any excess value ultimately realized from the TAB Fort Worth assets transferred to it over the amount necessary to pay the assumed liabilities and to reimburse FDIC Corporate for the approximately $250 million operating funds and related costs advanced Bridge Bank (and Deposit Guaranty Bank) by FDIC Corporate.

Plaintiffs argue that all this unfairly ignores the going concern value of TAB Fort Worth. But there is no evidence that on July 20, 1988, TAB Fort Worth had any going concern value—nor any approximation of what that would be—which could be realized in a liquidation, or any that could be realized in a purchase and assumption transaction that did not involve financial assistance from FDIC Corporate to the extent of hundreds of millions of dollars.

pellees assert, dictate the outcome in this case.

■ Since *White,* a string of federal cases have cemented the principle that the NBA mandates pro rata payment of claims as of the date of insolvency. *See, e.g., Scott v. Armstrong,* 146 U.S. 499, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892); *FDIC v. McKnight,* 769 F.2d 658, 661 (10th Cir. 1985), *cert. denied sub nom. All Souls Episcopal Church v. Federal Deposit Ins. Corp.,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986); *American Nat'l Bank v. FDIC,* 710 F.2d 1528, 1540 (11th Cir. 1983). *Scott* also affirms the principle that ratable payments are only required to be made to the extent of the assets of the failed bank: "The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor does not belong to the bank." *Scott,* 13 S.Ct. at 151. FDIC Receiver had a duty to make ratable dividends only from the amount that belonged to TAB Fort Worth at the date of insolvency; this amount was sufficient to pay each creditor only sixty-seven percent of its claim. The remaining portion of the $900 million that FDIC Corporate contributed to satisfy the unaffiliated creditors' claims at the time of insolvency belonged of right to FDIC Corporate, and thus did not belong to TAB Fort Worth. Neither the NBA nor the Federal Deposit Insurance Act imposed any duty on the FDIC to distribute this $900 million ratably.

Plaintiffs-appellees and the district court base their theory that the FDIC violated the ratability requirement of the NBA on *First Empire Bank v. Federal Deposit Ins. Corp.* and its progeny. *See* 572 F.2d 1361 (9th Cir.1978), *cert. denied* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538 (9th Cir.1987) (extending the principle of *First Empire* to state banks of which the FDIC is appointed receiver). *First Empire* arose on facts similar in many respects to those now before this Court. It involved the insolvency of United States National Bank of San Diego (USNB). The FDIC closed and was appointed receiver of USNB on October 18, 1973. The FDIC entered a purchase and assumption agreement with Crocker National Bank (Crocker) for most of the assets and liabilities of USNB. Certain assets and liabilities associated with USNB's controlling shareholder, however, were not assumed by Crocker. To make the purchase and assumption feasible, the FDIC in its corporate capacity lent the FDIC as receiver $128,780,000, which amount was among the assets transferred by the receiver to Crocker in the purchase and assumption agreement. The FDIC in its corporate capacity received and retained a first lien, superior to that of any unassumed creditor, in all the assets of the receivership estate not transferred to Crocker, to secure its $128,780,000 loan to the receivership. The creditors whose claims were not assumed sued the FDIC for payment in full. The district court held in favor of the FDIC, and the Ninth Circuit reversed.

In ruling in favor of those creditors, the Ninth Circuit held that sections 91 and 194 of the NBA apply to the FDIC when acting as receiver of a failed bank. It also found that in a purchase and assumption transaction the assumption of some liabilities in full, while the obligations of other creditors were not assumed at all, violated section 194 of the NBA. The court did note, however, that not every purchase and assumption agreement "must include every creditor in order to be valid. If the purchase leaves sufficient assets in the receivership to allow distribution to unassumed creditors equal to that undertaken by the acquiring bank as to the creditors it has accepted, distribution still could be ratable." *First Empire,* 572 F.2d at 1371.

Although at first glance *First Empire* appears to be identical to the present case, it is in fact significantly different. The FDIC made no provision for any payment of the creditors' claims that were not assumed in *First Empire;* the unassumed creditors, unlike the plaintiff TAB banks here, did *not* receive a ratable dividend *of the assets* of the failed bank. The Ninth Circuit's decision in *First Empire* seems to

be strongly influenced by this fact. The Court noted that:

> "In this case *the extraordinary extent of the lack of equal treatment* is emphasized by the fact that the unassumed creditors, left with only a claim against the undesirable assets of USNB remaining in the receivership, do not even have that questionable source of recovery unimpaired. They are subordinated to the lien of the Corporation [the FDIC] to secure its loan of money to the Receiver, all of which went to Crocker to make possible the advantage to the assumed creditors. This lien would without doubt consume in full the remaining assets, *leaving the unassumed creditors without any recovery whatsoever."* *First Empire,* 572 F.2d at 1371 (emphasis added).[9]

Thus, the purchase and assumption agreement structured by the FDIC in *First Empire* would have denied the unassumed creditors what they would have received in a straight liquidation (and indeed would have denied them any payment). That is not the case here, and that is the crucial distinction.

In addition to *First Empire,* a trio of federal district courts in Texas have recently been confronted with interpreting sections 194 and 91 of the NBA. *See MCorp v. Clarke,* 755 F.Supp. 1402 (N.D.Tex.1991); *Senior Unsecured Creditors' Committee v. FDIC,* 749 F.Supp. 758 (N.D.Tex.1990); *Texas Am. Bancshares, Inc. v. Clarke,* 740 F.Supp. 1243 (N.D.Tex.1990) (appeal pending). In *MCorp* and *Texas American* (the

district court's decision in the present case), the courts followed the lead of *First Empire* and found that the NBA prevents structuring a purchase and assumption transaction so that some creditors receive one hundred percent while others receive only liquidation value. In contrast, the district court in *Senior Unsecured Creditors' Committee,* after noting that this appeal was pending, declined to decide whether the *First Empire* interpretation of the NBA should be followed, but opined that:

> "the court sees considerable force in the FDIC's argument that the ratable distribution requirement of § 194 applies differently to purchase and assumption transactions, requiring only the ratable distribution of the value of the failed bank's assets as if it had been liquidated." *Senior Unsecured Creditors' Comm.,* 749 F.Supp. at 775–76 (footnote omitted).

### 3. Bankruptcy cases

Our holding is also buttressed by analogy to a line of bankruptcy cases involving payments to creditors of insolvent estates by third parties.[10] These cases establish that payment to a creditor of an insolvent estate by a source other than the estate does not create a preference, and any equal treatment required is based upon the creditors' share of the estate, not on benefits received from the collateral source. This proposition was established in two early Supreme Court cases. *See National Bank of Newport v. National Herkimer Co.*

---

**9.** The equities in the case at bar are not tilted nearly as much in favor of the plaintiffs-appellees. The plaintiff TAB banks are receiving the portion of their claim that they would have received had the FDIC chosen to liquidate TAB Fort Worth; they should not be heard to complain that the FDIC chose to structure the transaction in such a way that distributions to some creditors, achieved through government largesse, approached one hundred percent of those creditors' claims. The scales appear even more balanced when we reflect that TAB, as the sole owner and party in full control of TAB Fort Worth at all relevant times, must be assumed to bear primary responsibility for TAB Fort Worth's insolvency, and TAB was likewise the sole owner and party in full control of the other plaintiff TAB banks at all relevant times.

**10.** There is Supreme Court precedent for looking to bankruptcy law to decipher the meaning of the ratable dividend requirement of section 194. *See Scott v. Armstrong,* 146 U.S. 499, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892). In *Scott,* the Supreme Court resolved whether set-offs were allowed under the then-existing version of section 194 and its identical ratable dividend requirement by referring to the bankruptcy act of 13 Eliz. c. 7 and the "earliest reported decisions" under it. *Id.* 13 S.Ct. at 151–52. The Supreme Court thus at least implicitly recognized that the ratable dividend statute was to some extent patterned after bankruptcy statutes and that in an appropriate setting similar principles should guide the interpretation of both.

*Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); *Continental & Commercial Trust & Sav. Bank v. Chicago Title & Trust Co.,* 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268 (1913). In *National Herkimer,* the Court noted that "unless the creditor takes by virtue of a disposition by the insolvent debtor of his property for the creditor's benefit, so that the estate of the debtor is thereby diminished, the creditor cannot be charged with receiving a preference by transfer." 32 S.Ct. at 635.

Federal courts have expounded on this basic principle. In *Virginia Nat'l Bank v. Woodson,* the court noted that the test of whether a preference has occurred is "not what the creditor receives but what the bankrupt's estate has lost" because "[i]t is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer." 329 F.2d 836, 840 (4th Cir.1964). The Eighth Circuit has held, under this principle, that payments made to a debtor's creditors by an endorser, surety, guarantor, or payor in a business relationship with the debtor are not preferences because there is no transfer and resulting diminution of the debtor's estate. *See Brown v. First Nat'l Bank of Little Rock, Ark.,* 748 F.2d 490 (8th Cir. 1984); *DeAngio v. DeAngio,* 554 F.2d 863 (8th Cir.1977).

We find similar reasoning persuasive here. FDIC Receiver, on the insolvency of a bank, succeeds to the bank's estate and stands in the shoes of the debtor. *See Downriver Comm. Fed. Credit Union v. Penn Square Bank,* 879 F.2d 754 (10th Cir.1989) (noting that the FDIC takes control of an insolvent bank subject to the rights and equities existing prior to insolvency), *cert. denied* 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990). Just as a payment to a creditor by an individual acting as surety or guarantor of a debtor does not constitute a preference, neither does payment to a creditor by the FDIC in its corporate capacity.[11] Therefore, FDIC Corporate's contributions of $900 million to TAB Fort Worth and other TAB subsidiary banks that enabled some creditors to receive 100% of their claims are not preferential transfers that the plaintiff TAB banks can avoid and claim as assets to be distributed by FDIC Receiver.

### 4. Equitable considerations

As a final consideration, we note that although the NBA does not provide explicit statutory guidance for the disposition of all claims against the receiver's estate, we are guided by Congress's purpose in enacting the NBA. Congress did not anticipate by specific rules all of the problems that arise in national bank liquidations, but instead "chose achievement of a 'just and equal distribution' of an insolvent bank's assets through the operation of familiar equitable doctrines evolved by the courts." *American Sur. Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941). We are strengthened in our holding by noting that the equities favor the FDIC. The FDIC contributed approximately $900 million of its own funds—public monies—to cover the losses and fully compensate the unaffiliated creditors of TAB Fort Worth (and also of the other TAB subsidiary banks); the result is that each former TAB bank is open and operating today. A liquidation and the resulting disruption of the banking community and the general public was averted. Only the former shareholder of the TAB banks, and some of its wholly-owned subsidiaries, are now heard to complain, and they received everything they would have received had the TAB banks been liquidated. We think the FDIC's brief aptly summarizes the claims of plaintiffs-appellees as "an ill-founded attempt by investors in the failed TAB System to secure a windfall judgment from the FDIC to make good the losses suffered by them from TAB's financial debacle." We decline to award such a windfall.

---

**11.** Indeed, the FDIC in its corporate capacity, when it pays off insured deposits, is in substance acting like a species of guarantor or surety for the failed insured bank in respect to that bank's obligations to its insured depositors.

## C. FIRREA

The parties have also briefed extensively the issue of whether the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) controls the outcome of this case. One month after the Comptroller closed the TAB banks in July 1989, Congress enacted FIRREA. Among other things, FIRREA amended the Federal Deposit Insurance Act to provide that the maximum liability of the FDIC "acting as receiver or in any other capacity" to any person having a claim against the receiver or the failed bank shall be the amount the claimant would have received if the FDIC had liquidated the assets and liabilities of the bank. *See* 12 U.S.C. § 1821(i)(2). Without setting foot into the legal quagmire of whether FIRREA applies retroactively, we note simply that our holding here today is consistent with the result that would be reached on these facts under FIRREA; the FDIC is not compelled to pay a creditor more than the pro rata share it would have received if the FDIC had liquidated the bank.

### Conclusion

We accordingly reverse the judgment of the district court and remand with instructions to enter judgment for defendant-appellant FDIC.

REVERSED and REMANDED.