**In re MCORP FINANCIAL, INCORPORATED, MCorp Management, and MCorp, Debtors.**

Civ. A. H–93–395.

United States District Court, S.D. Texas.

Oct. 1, 1993.

Philip D. Anker, Wilmer Cutler & Pickering, Washington, DC, for Shearson Lehman Bros. Inc.

Allan Brent Diamond, Hughes & Luce, Houston, TX, Karen K. Suhre, Hughes & Luce, LLP, Dallas, TX, Steven Mark Zager,

Weil Gotshal & Manges, Houston, TX, for MCorp Management, MCorp. Financial, Inc.

Allan Brent Diamond, Hughes & Luce, Houston, TX, Karen K. Suhre, Hughes & Luce, LLP, Dallas, TX, Steven Mark Zager, D.J. Baker, Melanie Gray, Marta Andrews, Wendy Laubach, Weil Gotshal & Manges, Houston, TX, for MCorp.

Robert J. Clary, Owens Clary & Aiken, Dallas, TX, for Bank One Texas.

Ernest John Flowers, Law Offices of John Flowers, Earl A. Berry, Jr., Raymond La-Driere, II, Locke, Purnell, Rain, Harrell, Dallas, TX, for Principal Mut. Life Ins. Co.

Mark S. Lieberman, Rosenthal & Schanfield, Chicago, IL, for Barre Seid.

Richel Rivers, Hilgers & Watkins, Austin, TX, for Corpus Christi Nat. Bank.

Brooke E. Smith, Leonard Marsh Hurt Terry & Blinn, Houston, TX, William Frank Carroll, Donohoe Jameson & Carroll, Jeffrey W. Hurt, Terry Gorman, David A. Ives, Leonard Marsh Hurt Terry & Blinn, Ann C. Kenney, Leonard Marsh Hurt Terry & Blinn, Dallas, TX, for F.D.I.C.

Stephen A. Goodwin, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Ernst & Young.

Donald Joseph Christie, Kirkendall & Collins, Houston, TX, Robert J. Rosenberg, Latham & Watkins, New York City, for Official Committee of Unsecured Creditors of MCorp, MCorp Financial Inc. & MCorp Management.

Daniel Eustaquio, pro se, U.S. Bankruptcy Clerk, U.S. Bankruptcy Clerk's Office, Houston, TX, amicus.

Vernon O. Teofan, Jenkens & Gilchrist, P.C., Dallas, TX, for Ameritrust Texas, N.A.

Ruth H. Hunter, pro se.

Hayden Burns, M. Susan Hardie, Butler & Binion, Houston, TX, for Juniors.

Doug Little, Houston, TX, for Plaza Bank.

Kelly Dahlman, Thelen, Marin, Johnson & Bridges, Houston, TX, for D & O Insurers.

Sandra E. Mayerson, Jerome Meites, McDermott, Will & Emery, New York City, for Chemical Bank.

OPINION ON CONFIRMATION

HUGHES, District Judge.

### 1. *Introduction.*

After four years of complex bankruptcy litigation, the prospect of a vitalizing reorganization disappeared long ago. The debtors' estates are mere shells holding assets to distribute to their creditors. The debtors, creditors committee, and senior bondholders have proposed plans to liquidate those assets, without converting the case formally to a liquidation proceeding. A critical element of the plans is a settlement between the senior bondholders and the Federal Deposit Insurance Corporation that resolves all of the claims and counterclaims among the regulatory agency, debtors, and related entities. An analysis of the plans under the code, facts, and economics reveals that they, including the settlement, are in the best interests of the creditors, follow the law, and maximize the value of the estates' assets. The plans will be confirmed.

### 2. *Background.*

In confirming a plan, the court must look only at the plan's effect on the assets as they exist today; the court cannot judge the plan by comparison to actions that could or should have been taken in the past. The hard-fought, twisted past of these debtors may well have been full of missed opportunities for better results than are now offered, but only what is now possible can form a plan today. The only way the plans can be tested is by comparison to the present alternatives. Knowing how the estates have arrived at this point is, however, a useful context for the confirmation analysis.

#### A. *The Bankruptcies.*

Mercantile Bank of Dallas became a holding company that owned a group of separate banks. By the early 1980s, it had evolved into MCorp, owning twenty-five banks and five other kinds of subsidiaries. The collapse of oil prices at the end of 1985 resulted in a

parallel collapse in real estate. These twin economic shifts put a fatal strain on the banking system in Texas that was already suffering from excess capacity and desperate speculation. In the 1980s approximately one-third of Texas banks failed. MCorp was struggling to complete its absorption of Southwest Bancshares, another multi-bank holding company that had been near failing.

In the spring of 1989, worried creditors of MCorp filed involuntary petitions. As the holding company was meeting that challenge, the government engineered the insolvency of some of the subsidiary banks. It then closed twenty of MCorp's banks. The closures provoked two spasms of litigation: these bankruptcies and the Dickensesque claims between the debtors and the regulators. The FDIC has been the principal agency, but some cases have involved the Comptroller of the Currency and the Federal Reserve System. *See generally In re MCorp Financial, Inc.*, 137 B.R. 219 (Bankr.S.D.Tx.), appeal dismissed, 139 B.R. 820 (S.D.Tx.1992).

### B. *The Debtors.*

Technically, the debtors are three distinct companies. MCorp was the ultimate parent company, a bank holding company. MCorp Financial was the subsidiary that operated the banks. MCorp Management was a technical services subsidiary of MCorp Financial. MCorp Management, apart from intercompany debts, had relatively few creditors. The three bankruptcies have been jointly administered.

In addition to the banks, the debtors had significant non-bank assets. Although only one bank remains property of the estates, the total value of the estates' assets is over $407 million, excluding anything from the FDIC litigation. At this stage in the evolution of the estates, the assets include about $88 million of non-cash assets. Combined with the complexity of the debtors' affairs, the magnitude of the related losses, and the intrusion of the government, this wealth has resulted in an unusually high volume and intensity of litigation.

Approximately 2,000 claims for over $4 billion were filed against the debtors. The debtors objected to over $3.5 billion of these. In processing these claims, the estates have settled many claims for all of the normal reasons people choose contract over trial. Not all claims could be compromised, and the debtors have initiated or responded to numerous adversary proceedings.

Before proposing these plans, the debtors had eliminated over $900 million in claims for under $40 million by settlement. These settlements have been approved and paid. As part of the plans, the debtors propose a group of noncontroversial additional settlements of claims of $65 million for payments of about $18.5 million. These settlements exclude the settlement of the FDIC litigation.

Beyond the bankruptcy proceedings, litigation arising from the government's seizure of the banks and related regulatory acts includes:

- *MCorp v. Clarke*, CA3–89–831–F;
- *MBank New Braunfels, N.A. v. FDIC*, CA3–89–1064–F;
- *MCorp v. United States of America*, H–92–959;
- *FDIC, as Receiver for MBank Abilene, N.A. v. The North River Ins. Co.*, CA3–89–2138–F;
- *SRE Real Estate Fund v. MCorp Properties*, 91–1599, 192d Judicial Dct., Dallas;
- *MCorp v. The Prentiss/Copley Investment Group*, H–91–1131.
- *MCorp v. Board of Governors of the Federal Reserve System*, H–89–1677.

### C. *The FDIC Litigation: Defensive.*

The FDIC and the debtors have been fighting on two fronts for four years. The debtors' defensive front is in Houston where the FDIC has brought fourteen claims against the estates totaling between $262 million and $305 million. These claims were originally brought for over $800 million.

The debtors have responded with several counterclaims. Some of these claims repeat or depend on the outcome of the debtors' Dallas litigation. Some of them would result in establishing claims that would be paid from the receivership estates of closed banks, including intercompany debts. Not counting

the value of the repetitive claims, the debtors' counter for approximately $84 million.

### D. *The FDIC Litigation: Offensive.*

The debtors' affirmative front is in Dallas, where the debtors have sued the FDIC for damages from the governmental conduct that culminated in the wrongful closing of twenty banks. In essence, the debtors contend that the FDIC and the Comptroller of the Currency manufactured claims of insolvency against the banks that were solvent so that the agencies could get control of the bulk of the MCorp banking empire rather than being limited to the prospect of receiverships for the two metropolitan banks. The debtors' theory produces damages estimated from $76 million to $327 million.

Also in Dallas, the debtors have filed a complaint against the FDIC and Comptroller under the Federal Tort Claims Act seeking $200 million based on the same conduct. Finally, the FDIC as receiver for MBank Abilene seeks $2.375 million of proceeds from an indemnification policy that MCorp Management purchased from MBank Abilene.

### E. *The Creditors.*

The creditors of the estates whose interests are affected by the plans or who object include:

*Employees:* Although most of the claims by employees were settled long ago, some employees still have claims totaling $22 million. They will be settled through the plan.

*Senior Bondholders:* These bondholders have a claim of approximately $354 million. The notes are the obligation of MCorp and MCorp Finance jointly. These bonds are not secured. References to the seniors generally refer to these bondholders.

*Other Seniors:* Other claimants with senior status seek under $1 million.

*Junior Bondholders:* These bondholders have a claim of approximately $134 million. Although these notes were issued earlier than the senior bonds, the juniors' rights were expressly subordinated through the indenture by the juniors as a condition of the seniors' funding their notes. The notes are the liability of MCorp and MCorp Financial jointly. When Chemical Bank appears in these proceedings, it is appearing as the trustee for the junior bondholders under the indentures.

*Principal Mutual:* Principal Mutual is an Iowa insurance company that became a mortgage lender to MCorp's now defunct landlord; it is now the landlord of the old Mercantile Center, a complex of buildings in Dallas that served as MCorp's headquarters. MCorp rejected the leases in the bankruptcy. At the moment, Principal Mutual asserts claims of about $53 million. This bundle of claims has been the subject of a lengthy trial of the merits, but this court has not rendered a decision.

*The Insurers:* These companies, including Corporate Officers and Directors Assurance Ltd. and A.C.E. Insurance Company, insured the directors and officers of the banks for their professional responsibility. While the FDIC has threatened suit against them, none has been filed. A settlement between the FDIC and the insurers has been reported in the range of $39 million. The insurers' claim for a contingent indemnity was denied by the bankruptcy court, and their appeal has recently come up from the bankruptcy court.

*Shearson:* Shearson Lehman Brothers is the largest holder of MCorp money market preferred shares. This is the most senior class of equity, and it is entitled to a distribution from the estates after the junior bonds are paid. Shearson's claim is for $117.5 million. Shearson has a working arrangement with the junior bondholders.

### 3. The Path to the Plans.

After numerous extensions, the debtors filed a series of disclosure statements and plans in 1991. The bankruptcy court approved the third proposed disclosure statement, after revisions. The plan was for the debtors to liquidate the estates. The bankruptcy court denied confirmation at the start of 1992. The court concluded that the plan's limit of $2 billion in contested claims to $120 million was an arbitrary use of the bankruptcy code's procedure for estimating claims. *See In re MCorp Financial*, 137 B.R. at 226.

After the official unsecured creditors' committee expressed a desire for a global settlement with the FDIC, the debtors responded that the years of litigation had eroded the goodwill between the FDIC and them. At this point, some creditors holding senior bonds formed an *ad hoc* senior bondholders group with its own counsel. It pursued a settlement. In the fall of 1992, the senior group agreed with the FDIC that all litigation would be abandoned mutually and the FDIC would be paid $32 million. Initially, neither the debtors nor the creditor's committee supported the settlement because of the cash cost to the estates.

At the beginning of this year, the seniors and the debtors presented plans to the bankruptcy court. This court withdrew the reference of the case to the bankruptcy court for the purpose of considering whether to approve the disclosure statements and to confirm the plans.

As progress was being made in some negotiations, the court began requiring frequent status conferences with counsel. After a few months, at the suggestion of the creditors' committee in open court and on the record, the court announced it would mediate. No objection was heard. Over several days in two segments, the court met with principals from the major parties, except Principal Mutual, whose principals declined to participate. The meetings were with all sides represented by people with knowledge of the facts and some authority. The court met with parties, counsel, and counsel with parties at various times. While the court was listening to one cluster of people, the others were meeting in jury rooms.

After several days of intense, continuous exchanges among the parties, the court concluded that as much progress as could be expected by its intervention had been accomplished and that the status conferences with counsel would resume every other afternoon. At the last moment, principals from the seniors and the juniors announced in open court that they had reached an accord.

When that agreement unraveled, another mediation session was held a month later. At the end, the court again announced that an impasse had been reached and that, unless the parties on their own could find a solution to the problems that had been identified, the court would be obliged to revert to formal proceedings under the code.

At that point, after two months of sitting on the sideline and having never objected, Principal Mutual moved that the judge recuse himself. After the court denied the motion on the grounds that Principal Mutual had not objected and that nothing had been disclosed in the mediation that was not of record, Principal Mutual sought a writ of mandamus from the court of appeals to remove this judge from the case. Before the hearing on the application for the writ of mandamus, the juniors joined Principal Mutual's request. The juniors joined in the recusal attempt after the seniors rejected their extortionate demand for $20 million to keep them from fouling the proceedings. The juniors, of course, did not object to the mediation; they actively participated in the mediated negotiations, and they were the principal beneficiaries of this court's efforts. The court of appeals denied the writ.

### 4. The Plans.

Out of the wreckage of those negotiations come these plans. They are proposed by the debtors, the seniors, and the creditors' committee. They propose a separate plan for each estate with the single goal of distributing the assets. Although the bankruptcies were begun to reorganize the debtors, none will survive. The plans establish three trusts

to liquidate the non-cash assets so that the cash can be disbursed to the creditors.

During the confirmation hearing the proponents introduced extensive evidence of the net present value of the debtors' non-cash assets. The extent of the evaluation evidence was in part a response to the bankruptcy court's rejection of the first plan because the liquidation values had not been established adequately. *See In re MCorp Financial*, 137 B.R. at 228–31. The second round of testimony was essentially a careful, thorough analysis by an accountant at Ernst & Young. His evaluation of those assets is highly credible and almost entirely uncontroverted by anything except argument. *See infra* § 8.B. The court relies on it for the discussion of recoveries proposed in the plans, as indeed did the expert for the juniors.

The plans distribute $41,460,000 for priority claims on its effective date. These payments include administrative expenses, intercompany debt, and settlements other than the FDIC, and part of the FDIC settlement. *See infra* § 4.A. The plans project no distributions to equity. The juniors' distributions are to come from the proceeds as the non-cash assets are liquidated; these values, costs, and discounts show a probable net present value of $6,352,000. The realization of that amount will be affected by the accuracy of Ernst & Young's evaluation, the eventual size of Principal Mutual's recovery, underestimation of professional fees, and market changes.

### A. *The FDIC Settlement.*

The linchpin of the agreement among the proponents involves a modified version of the settlement achieved between the FDIC and the seniors. The plans provide for a distribution of $25,815,000 to the FDIC on the effective date, with an additional distribution worth a present value of $7,239,000 during the pendency of the liquidating trusts. The $7 million represents the 9.02% share of the expected liquidation of the non-cash assets on March 31, 1993.

The $33,054,000 distribution to the FDIC is offset by the seniors having limited their recovery on an undisputed prior claim of $354 million to a distribution that has a net present value of $319,150,000. After having waited four years for any distribution on their ordinary senior debt, the senior bondholders conceded enough of their claim to fund a settlement with the FDIC; it was clear to them this spring that until the FDIC litigation was resolved no progress could be made and that they would lose more in foregone interest during the coming years than the current price for peace with the FDIC. This concession enabled the debtors and the committee to support the FDIC settlement.

### B. *Technical Aspects.*

Without reproducing the plans, some technical aspects of them are pertinent to the objections.

#### (1) *Shearson as a Senior Claimant.*

In addition to its equity holdings, Shearson has a senior claim that is solely the obligation of MCorp. Because the estates have not been consolidated in substance, the number of estates that are liable for a creditor's claim may affect distributions. For example, if Shearson's claim against MCorp is not paid before all of the other senior claimants against MCorp Financial receive their distributions, it is possible that the juniors may begin to receive distributions from MCorp Financial before Shearson's claim is paid.

Shearson objects to the possibility that the juniors might be paid something before it is paid. During the confirmation hearing, the proponents made a correction to the plans to ensure that the juniors would receive no distributions from an estate until all senior claims were paid, rather than merely all senior bondholders, as the plans appeared to say. This change solved Shearson's intra-debtor problem but not its inter-debtor one. The senior bondholders are not affected by this problem because their notes are the liability of both MCorp and MCorp Financial.

#### (2) *Principal Mutual and the Insurers.*

The plans provide for a contingent claims reserve. That mechanism currently reserves full pro rata amounts for contested claims but nothing for disallowed claims. For example, Principal Mutual's full pro rata share of $18 million is protected in the reserve,

while the insurers' disallowed claim is not. Once this court determines how much of Principal Mutual's claim to allow, the plans will reserve only the pro rata amount of that figure. Both creditors desire to amend the plans to require reservation of the pro rata amount of their full claims in the contingent claims reserve until final, non-appealable orders have been entered.

### (3) *Voting.*

The class of the juniors was the only one actively to reject the MCorp and MCorp Financial plan. Equity was assumed to reject the MCorp plan. All classes voted in favor of the MCorp Management plan. At the confirmation hearing there was some confusion over the effect of Principal Mutual's vote. Principal Mutual is a member of the senior class, but its vote was not counted because its claim is contested. The testimony at the hearing revealed that even if Principal Mutual was allowed to vote its full claim, rather than no claim or its pro rata distribution on its full claim, the class would still have voted to accept.

The only potential problem was Principal Mutual's motion to treat the seniors as insiders, and not to count their votes for acceptance purposes. While the court denied that motion, under Principal Mutual's best scenario of its getting to vote the full $53 million claim and the seniors not getting to vote the necessary two-thirds dollar amount acceptance might still have been reached.

An insider is someone connected to or in a position of authority with the debtor. 11 U.S.C. § 101(31) (Supp. IV 1992). An insider's acceptance does not count. 11 U.S.C. § 1129(a)(10) (1988). To the extent that the seniors' position as a co-proponent of the plan involved a working relationship with the debtors, that relationship was the paradigm of arms-length bargaining, the true test of lack of insider status. *See Cimino v. Writer Corp.,* 125 B.R. 293 (Bankr.D.Colo.1991). The seniors are not insiders of the debtors, and the senior class voted for the plan.

### 5. *The FDIC Settlement.*

When the creditors are arranged in the priorities set in the bankruptcy code and common law, the available funds pay the claims through the seniors but barely. Specifically, there is a margin of about $6 million in assets beyond the seniors' claim; this excess is all that is available to the juniors unless some asset produces a larger recovery than the plans anticipate. Because this line falls just above the seniors' claim amount, if the estates were to expend either time or money to pursue their claims against the FDIC without recovering a monumental judgment, it would be directly at the expense of the seniors after the first $6 million of cost.

Although the attacks on the FDIC settlement have taken a variety of guises, they can be fairly reduced to two themes.

1. The value of the claims against the FDIC has been materially undervalued.

2. The cost to the creditors and estates of further litigation has been materially overstated.

The proponents justify the settlement and distributions now by an analysis (a) of the cost of delay and (b) of the expense, risk, and uncertainty of the litigation. This includes an evaluation of the claims by the FDIC as well as the claims against the FDIC. The juniors argue that to pay the FDIC over $30 million and forego the potential of affirmative recoveries against it clearly undervalues the assets of the estate. A particular set of self interests are at work here. The seniors' best interests are served by distributions now, achieving a sizable percentage of their original claim and avoiding the potential of an FDIC affirmative recovery larger than the $34 million that the seniors are giving up through the limit on their claim.

The juniors, because of the nature of subordination, are to be paid about five percent of their claim. In fact, if their fears about overvalued non-cash assets and understated professional fees are realized, they may wind up with nothing. It is in their economic interest for the estates to litigate with the FDIC to the end, precisely because their amount at risk is relatively low and their gain could be huge. From their perspective, as well as from the perspective of the equity holders, they are litigating with other people's money. If the FDIC wins, other credi-

tors will suffer substantial losses; the juniors have little to lose. The analysis of the propriety of the settlement cannot come from either of these points of view. Instead, it must come from the estates' view. Whatever the legal standard, the settlement must maximize value to the estates, not to any single creditor.

### A. The Legal Standard.

How a settlement should be approached for approval is a matter of some dispute. The proponents argue that the settlement should be approved under a reasonableness test first, and then the plans should be confirmed under the fair and equitable standard. The juniors argue that approval of the settlement must be on the same standard as confirmation of the plans.

■ The most important standard is procedural; the proposed settlement must have been inspected by the court. In reviewing the settlement, the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents. It must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation. *See Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968). Voluminous stock recitations so loved by lawyers and judges, with the catch phrases of the code thrown in among the empty jargon, will not do. *Id.*

To determine whether the plans withstand close examination, this court has heard over fifty hours of testimony and legal argument during this confirmation hearing, over ninety percent of which was about the proposed settlement. The court has heard testimony from both sides on the relative merits of the litigation, the likelihood of judgments being entered and upheld or reversed, the proper economic analysis for quantifying those outcomes, and the factual predicates for the experts' positions.

In addition to the confirmation hearing itself, this court has accumulated a large store of background information about the debtors and the other parties. This court signed the order closing the debtors' banks in the Houston region on the application of the government; heard the debtors' action against the Federal Reserve Board's capital allocation directive; presided over most of the debtors' defensive litigation; and, by necessity, acquired a familiarity with the Dallas litigation.

■ Whatever standard is used, it must be established by a preponderance of the evidence. *See Heartland Federal Savings & Loan Ass'n v. Briscoe Enter., Ltd.*, 994 F.2d 1160, 1165 (5th Cir.1993). Two standards are described in the cases. One of the standards, apparently the lesser one, is a bare reasonableness test: A settlement is to be approved if it can be said to have reached the lowest point in the range of reason. *See In re Teltronics Svs., Inc.*, 762 F.2d 185, 189 (2d Cir.1985).

The other standard is a fair and equitable test: A settlement is to be approved if it can be said to have treated the affected interests fairly and equitably. Because the terms of this rule are less than precise, courts tend to list the factors that should be taken into account in an effort to reveal whether the settlement is fair and equitable. One list is: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and the attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *See, e.g., In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir.1980). Although the factors speak of plain reasonableness, they especially seem to focus on reasonableness in the sense of trying to discover arbitrariness or collusion.

■ In assessing a settlement, the factors must be tailored to the factual context and complexities of the particular settlement. Some situations require a detailed list of specific aspects of the terms of the settlement. *See, e.g., American Employers' Ins. Co. v. King Resources Co.*, 556 F.2d 471 (10th Cir.1977). In this case, the difficulties in collecting judgments from political agencies must be considered. *See, e.g., Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir.1929). Be-

951

cause the concepts in both rules are elastic, the "standard" chosen is less important than the specific analysis and particular factors used in applying the standard.

The juniors argue, however, that the fair and equitable standard has the specific meaning assigned those words in the Bankruptcy Code. *See In re AWECO, Inc.,* 725 F.2d 293 (5th Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). The code used those words as a term of art that meant that senior interests are entitled to full priority over junior interests. *Id.* at 298. Because no junior receives more value than a senior claimant, the settlement absolutely meets that particular invocation of the phrase "fair and equitable."

■ Next, the juniors insist that the settlement must meet a higher standard because it is part of the plans rather than an independent settlement. *See id.* Whether the settlement is proposed during pre-confirmation proceedings or contemporaneously as part of a plan is entirely beside the point. These estates have paid more money in settlements before these plans were ever proposed than the attacked settlement distributes to the FDIC. Of course, using a different standard in plan-connected settlements than in independent pre- or post-plan settlements lacks an economic, legal, or rational basis. If a settlement is essential to the plan and if it treats one class better than its statutory position, a higher standard may be necessary, but only to the extent of protecting senior creditors' rights. This is not an issue in this case. *See Aweco,* 725 F.2d at 298.

### B. *Law of the Case.*

■ The argument has been made that the bankruptcy court's findings in rejecting confirmation of the earlier plan has established law of the case about the value of the FDIC litigation. This is wrong. First, the bankruptcy court did not rule on the merits of the FDIC litigation, but rather it was concerned with the arbitrary estimation that the debtors proposed. *See In re MCorp Financial,* 137 B.R. at 225–26. Second, the disapproval of a plan is an interlocutory decision that can be revised by the trial court as

changes in the facts, evidence, and law may suggest. More important, what matters to this court in considering this settlement is the expected value of the litigation today, based on the evidence now about the risk, uncertainty, cost, delay, recovery, and collection. What the value may have been one year ago or what it may be a year from now is irrelevant. The task of evaluating the litigation today is difficult enough; to bind the court to earlier, partial examinations of the valuation of the litigation at other times in other contexts is economically and practically nonsensical.

### 6. *The Economics of Evaluation.*

■ To ascertain which factors to apply, this economic framework must be understood: The net present value of the FDIC litigation is the expected outcomes of the litigation multiplied by the likelihood of those outcomes, less time-adjusted expenses and less the opportunity costs in the meantime.

### A. *Expected Outcome.*

In this instance it is important to remember that the expected outcome is the actual recovery of money. It requires an evaluation of the likely results in the trial court and changes of that result in the courts of appeal and, then, collection on the judgment. In this case especially, an evaluation of the collectability of the judgment ultimately obtained is crucial for two reasons. Some of a recovery against the FDIC would be in the form of receiver's certificates as a claim against the final net assets of a failed bank. The FDIC is a political institution that is subject to different rules, including after-the-fact assistance from congress. Although that kind of differential has no place in a republic, it is an operative fact in the real world.

The FDIC has resources and advantages that would make any reasonable adversary pause. Despite the difficulty of winning management malpractice cases, the insurers recently paid $39 million to settle *potential* claims against MBank Dallas's officials by the FDIC. This is high profile litigation, the type that regulators in Washington do not like to lose.

## B. *Likelihood of the Outcome.*

For a given outcome, there is a degree of both risk and uncertainty associated with it. Risk is the probability of an outcome. Uncertainty is the degree that the actual risk is not known. For example, when you roll a normal die, the risk is a precise one-sixth that your roll will show one of the six particular numbers. If you did not know how many faces the die had, the risk would be a range of outcomes bordered by your estimate of the high and low number of possible sides. On the other hand, you could know that there were thirty-six faces to the die but that the numbers one through six were not equally distributed on the faces; the likely outcome would also involve risk and uncertainty. An expected outcome must be reduced for risk and uncertainty.

## C. *Expenses.*

Expenses of supporting the litigation have to be subtracted from a recovery. The expenses of maintaining the estates during the pendency of the litigation have to be subtracted. These costs will increase over the length of time they are actually disbursed by the estates before a recovery from the FDIC is collected. These costs will be partially offset by the interest that the estates earn on the assets that would have been otherwise distributed.

## D. *Net Present Value.*

Simply put, in placing a value today on a recovery in the future, the recovery has to be discounted for the delay in receiving the money. A dollar tomorrow does not equal a dollar today. The tests for actions under the code are based on an evaluation of the assets "as of the effective date of the plan." 11 U.S.C. § 1129(a)(7)(A)(ii) & (b)(2)(B)(i) (1988). The years that the estates are not able to make distributions pending conclusion of the litigation has a cost to all creditors who would get a distribution, and that cost is real.

The two aspects to net present value are the length of time until payment and the risk-adjusted interest rate. The likely time until a final resolution of the offensive litigation in the debtors' favor is highly uncertain.

The FDIC has assured the court that it does not anticipate becoming less thorough in its defense than it has been the last four years.

The rate of interest to use in discounting a future recovery is obtained by adding to the risk-free short-term interest rate, a number equivalent to the expected rate of inflation and a number that compensates for risk. The risk number takes into account what the money invested in the litigation could earn if it was free to move in the market to an investment with similar characteristics for potential loss.

An illustration: Assume that the expected outcome of two years of litigation from the effective date is a final collection of $100. Assume that the likelihood of that outcome is 75% and the likelihood of zero is 25%. Because of the uncertain state of many of the conditions that may contribute to the favored outcome are unknowable, the real expected outcome would be estimated by a range, like between 65% and 85%. Assume that the costs of litigation and of the continued existence of the debtor for two years are $12, and assume that the interest earned on the existing assets that would otherwise have been distributed is $8. Assume that the debtor has $400 in distributable assets. Finally, assume that an investment of equal risk of loss would require a 10% rate of return in the market, as the opportunity cost. The potential recovery of $100 in two years from litigation is actually worth the $75 recovery less $4 net costs, less $84 of opportunity costs, producing a net present value at the confirmation date of –$13. The net present value to the estate is –$13, not $75. The estate should drop the litigation and distribute its assets.

The importance of the time value of money can be illustrated simply by reference to the facts of this case: If the debtors were to delay distributing the funds on hand of $319 million to pay against the seniors' claim of $354 million for five years at today's prime interest rate of 6%, the juniors' claim of $117 million could be paid in full merely by the passage of time. Time does not, of course, create new principal. The gain to the juniors would exactly equal the loss to the seniors.

As the juniors' claim accreted, the seniors would erode.

### E. *Factors.*

■ With this economic and factual context of the estates in mind, the settlement should be approved if it is reasonable to conclude that the net present value of the benefits from the settlement exceed the expected net present value of the benefits to be gained from the litigation. Among the factors to be considered are:

- The range of outcomes of the litigation with the probability of each.
- The degree of uncertainty in the estimates of the outcomes and probabilities.
- The utility of the present known results of the settlement compared with the uncertainty, delay, and transaction costs of continued litigation.
- The collateral litigation problems, including witness motivation, evidence availability, preparation time, and counsel continuity.
- The effect of the uncertainty, expense, and delay on the other aspects of the liquidation.
- The classes of creditors actively supporting the settlement.
- The sophistication of counsel supporting the settlement.
- An evaluation of the settlement's cost to the total liquidation value.
- The hazard of political interference with the FDIC's liability for its wrongs and with its capacity to pay a judgment.
- The nature of the debtors as liquidating estates rather than reorganizing companies, especially the effect that that has on effective pursuit of the litigation.
- The nature and breadth of the settlement.
- The character of the bargaining that resulted in the settlement.

As important are the factors that are not to be considered. These include:

- Sunk costs.
- The parties' earlier positions on the merits of the litigation.
- The payment to the FDIC.

- The identity of the bondholders or their cost bases.

■ The costs that the estates or other parties have incurred up to this point cannot increase or decrease the actual value of the litigation. The only influence historic costs may have on a decision made today is to the extent that the expenses resulted in a presently valuable resource to the estates for the prosecution of their claim. They are sunk costs. There is a human (and governmental) tendency to consider money already spent as a factor in whether to continue. Having spent $20 million in pursuing a claim for $10 million does not make the claim more valuable than it already was. Indeed, the law of diminishing returns would suggest the opposite. A gambler who continues to bet on a poker hand *because* she has already bet a large amount on it is a debtor who insists on pursuing a claim because it has already spent millions on the suit. The value of continuing the litigation is not affected by the amount already spent. The likelihood of a horse winning a race is not affected by the amount you have bet on this race, much less is it affected by the amount you bet and lost on its earlier races.

■ Similar relics of no interest are the parties' former positions. The juniors complain that until recently the debtors argued in favor of continued litigation. The juniors have confused the debtors' belief in the merits of their claims and defenses against the FDIC with the debtors' analysis of the estates' economics, including what will happen to those claims and defenses. To the extent that the debtors have formally argued for continued litigation in the past, presumably they calculated a positive recovery. In the course of four years of multi-billion dollar litigation through a dozen major lawsuits and three bankruptcies, with intervening legislation and many settlements, the court would be surprised if positions had not evolved. Circumstances change, and the debtors' earlier positions, absent a formal judicial admission, are not binding on them or the court.

If the juniors are making an argument that this proposal is being made in bad faith because it differs from an earlier proposal,

the least the juniors should do is offer some evidence of which of the two was made in bad faith, since it is equally likely, if the debtors are scoundrels, that it was the first proposal that was in bad faith. From the record, it is easier to believe that the litigation might have been continued against the FDIC by the debtors out of spite than to believe the debtors are colluding with the FDIC. Casual arguments of bad faith tend to reflect more about the accuser than the accused.

The motivation for the debtors to accept the settlement is that the seniors have put an upper limit on their claim. This cap explains both why the debtors' change of position is consistent with their view of the estates' prospects and why the payment to the FDIC affects no other creditor than the seniors. As long as the amount already due the seniors is greater than the payment to the FDIC, the effect on the estates is neutral. There is a technical chance that the ultimate payment to the FDIC could exceed the senior cap because of the mechanism of paying to the FDIC 9.02% of the value of the liquidation of the non-cash assets. This would occur only if the non-cash assets have been undervalued by $17 million; that is, the non-cash assets would have to yield about 20% more than is expected. Of course, if the court assumes a gross undervaluation, it would benefit the juniors, who would receive 90.8% of the excess recovered for the non-cash assets.

The payment to the FDIC has the same effect on the estates as if (a) the litigation were settled for a mutual non-recovery, (b) the seniors received their full claim from the estates, and (c) then the seniors separately paid the FDIC $32 million. The seniors' reduction of their claim to make available funds to pay the FDIC gives up an undisputed senior claim to the extent of the payment. The potential for a harm to the estates is the loss of a possibility of recovery on the debtors' claims against the FDIC. If the net present value of that litigation is positive, then the estates have lost that value. For all practical purposes, the settlement is a draw.

In a peculiar argument, the juniors have contended that the seniors' opportunity cost could be stopped at any time by the present individual holders' selling the bonds. The juniors mistake the issue of opportunity cost to the claim for a personal one to the present holders. Whoever holds the bonds will have a claim for $354 million. Because that claim is entitled to payment and because there are funds to make the payment, as an economic concept, delay in paying that claim incurs a cost to the holder. Every individual who owns a claim may end his personal misery from association with these bankruptcies by selling his claim.

### 7. Assessment of the FDIC Litigation.

Peter Bartholow testified for the debtors about the management, financial, and tactical reasons behind the debtors' support for the plans and the settlement. Bartholow has been the principal executive for the debtors during the bankruptcies, and he has been with MCorp since its incorporation in 1975. The seniors offered the testimony of William Mellon who, as a senior bondholder, described the investment banking factors that affect the seniors. Two distinguished Houston trial lawyers furnished expert testimony about the prospects, costs, and timing of the FDIC litigation, with Rufus Wallingford for the proponents and Fred Hagans for the juniors. John Finnerty was the financial expert for the proponents, and Warren Cole was the financial expert for the juniors.

It has become fashionable to comment expressly on the credibility of expert testimony. Wallingford's testimony clearly showed a thorough examination of the vast record in all aspects of the litigation as well as an understanding of the legal issues. Wallingford drew on support from a six-member analysis team from his firm. Wallingford was criticized for his disagreement with preliminary views of other lawyers working with him. That he disagreed and supported that disagreement strengthens his testimony. Where everyone thinks alike, no one is thinking very much.

Hagans's approach was to rely on the nearly anonymous preparation of a lawyer in Washington for the juniors and on Wallingford's work. A fresh lawyer is frequently able to compose an accurate evaluation of complex litigation better than those who have

been intimately involved. As Hagans pointed out, lawyers who are compensated by contingent fees must be able to evaluate cases with some degree of accuracy in the decision whether to accept a case. Hagans reviewed the analyses of other lawyers and added his own estimations of the likely outcomes. His lack of independent knowledge of some critical areas of the litigation affected his ability properly to assess the range of probable outcomes. It was especially troubling to the proponents that his estimates of the debtors' probable recovery were made after less than eight hours of review of the materials. Some aspects of his discounting for risk were not entirely clear, as one might expect in an expert on law rather than economics.

Finnerty has been an expert witness in other parts of this litigation, at the behest of the FDIC. He demonstrated a profound knowledge of the debtors' estates and the economic effects of changing times, rates, and valuations. His analysis was resilient under the opponents' examination.

Cole's testimony was candid, and he was well-grounded in the particular assets of the estates. His analysis, however, relied on the passage of time to redistribute the assets between categories of claimants.

■ Evaluation of a lawsuit inevitably requires some degree of speculation. *See In re Texas Extrusion Corp.,* 844 F.2d 1142, 1159 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988). The goal of the bankruptcy process is to require as precise an analysis as the circumstances reasonably permit, without discouraging settlements or engaging in wasteful justification proceedings.

A. *The Expected Outcome: The Dallas Litigation.*

In the Northern District of Texas, the district court entered a summary judgment that the FDIC was liable to MCorp under the National Bank Act. Based on a post-decision opinion of a court of appeals in similar litigation, the FDIC has moved for reconsideration. *See Texas American Bancshares, Inc. v. Clarke,* 954 F.2d 329 (5th Cir.1992). That decision, known as *TAB,* held that it was legal for the FDIC to treat affiliated creditors of a failed bank worse than non-affiliated creditors. That decision may directly erode the judgment in the Dallas litigation; while the debtors believe that there are factual distinctions between the cases, there is a high probability that the debtor's National Bank Act claim will not survive the trial court's reconsideration or the court of appeal's review. In fact, that court implied as much in recognizing its disagreement with the district court's decision in the Dallas litigation. *See id.* at 338.

Hagans argued that evidence of bad faith on the part of the FDIC in closing the MBanks differentiates this case from *TAB.* While the abuse of power was manifest, the meeting of the FDIC board that shows the compelling evidence of bureaucratic bad faith was the same meeting that closed the Texas American Banks, which were the banks in *TAB.*

The debtors' second Dallas claim is under the Bridge Bank Act. To succeed, the debtors will have to convince the court that the federal funds held by the closed banks were deposits or became deposits rather than ordinary debts. Hagans relied on the Bridge Bank Act's broad definition of deposits. On the other hand, Wallingford relied on the banks' contemporaneous records that show the funds were not included in the accounting for deposits in concluding that the probability of success is very low. Without fully deciding all of the component legal issues, the record supports a firm conclusion that the FDIC will employ its panoply of defenses and that the debtors' reasonable expectation of recovery on the claim under the Bridge Bank Act is low even before considering the costs and delays. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

The debtors filed a claim under the Federal Tort Claims Act in response to the FDIC's position that the claims in the Dallas litigation should be tort claims subject to that act. In the record, no one challenged Wallingford's conclusion that this claim of the estates would fail to overcome the FDIC's exception for its discretionary acts. There is a signifi-

cant probability that the debtors' Dallas litigation will fail on the merits.

### B. The Expected Outcome: The Houston Litigation—The FDIC's Claims.

This court has disallowed most of the FDIC's claims against the estates, leaving a total allowance of $2.2 million. A final order has yet to be entered. Wallingford supported both the merits and the likelihood of the court of appeal's sustaining those decisions. In one respect, however, Wallingford did see some exposure. This court dismissed several of the tort aspects of the claims on the grounds that the state statute of limitations had run, eliminating an FDIC claim of about $120 million. In refusing to hear an interlocutory appeal, the court of appeals may have indicated its belief in the merits of the FDIC's appeal causing Wallingford to conclude that it was more probable than not that the summary judgment on limitations would be reversed, requiring both the expense of litigation of those claims and the exposure to potential recovery by the FDIC in some amount.

Without estimating the potential value of the "revived" tort claims, the court estimates that it is more likely than not that the FDIC will recover $2.2 million on its claims.

### C. The Expected Outcome: The Houston Litigation—The Debtors' Claims.

The debtors' counterclaims are set for trial, but have yet to be heard. Two of them rely on a favorable outcome of the Dallas litigation. The equitable subordination claim and the contingent claims for consequential damages cannot stand absent success in Dallas. The unreimbursed claims for rent and employee loans have a low probability of success because of the FDIC's defenses. See D'Oench Duhme, 315 U.S. 447, 62 S.Ct. 676.

This court has ruled in favor of the debtors on the tax allocation and tax refund claims for $25.5 million and the administrative expense claims for $16.5 million. Wallingford concluded that the nature of the debtors' claims was adequate to defeat the FDIC's defenses. The court continues to view these two claims as having a substantial likelihood of survival.

### D. The Expected Outcome: The Houston Litigation—The Net.

Assuming that the judgment stands against the FDIC's tort claims, the probable outcome of all the litigation is a recovery by the FDIC of $2.2 million and a recovery by the debtors of $42 million, for a net recovery to the debtors of $39.8 million. The recovery by the debtors, however, will be paid in receivership certificates because their affirmative victories would be against the FDIC as receiver of the estates of two failed banks. This creates a second valuation problem.

The testimony showed that the FDIC does not reveal how it values receivership certificates in a particular institution's estate. In the absence of meaningful disclosure by the receiverships, the court relies on the economic analysis of the certificates by Finnerty. Using a range of assumptions about delayed disbursement on the certificates until the receivership ended, uncertainty about the liquidation value of the underlying assets, and exposure to claim dilution and running four combinations, Finnerty valued the certificates between 20% to 43% of face value. While the court finds highly credible his classification of 43% as the upper end of the range of values, for ease of calculation, the court will use a collectability factor of 50% on receiver certificates. Depending on when the credit for the counterclaim may be taken, this leaves the debtors with a maximum collectable recovery of $19.9 million, net of the counterclaim. This is the value of the probable outcome.

### E. The Likelihood of the Outcome.

The standard for the likelihood of success has been assumed to be that the event is more probable than not or just over 50%. That estimate will suffice because the experts tended to couch their conclusions in more-likely-than-not language. The risk of the summary judgments being overturned is compounded by the uncertainty of the litigation if the FDIC's tort claims are revived. A large range of uncertainty surrounds the ultimate results in the litigation. One unusual factor is the political ramifications, including

the potential for congressional action to protect itself from ultimate responsibility for a judgment against the FDIC, whether it is passed to the taxpayer directly or indirectly through an increase in the banking system's costs. These factors persuade the court that the likelihood of a $19.9 million recovery is no better than 50%, making its economic value its apparent value of $19.9 multiplied by its likelihood of 50%, resulting in a expected value of $9.95 million.

## F. *Expenses.*

There is one certainty about the prospect of continuing the litigation, and that is it will take a long time. How long is disputed, but most of the estimates fell into the three- to five-year range. Given that the FDIC is not constrained by the ordinary economic forces that affect private parties, that it has resourceful counsel, that it has statutory exemptions, like not being required to post *supercedas* bonds for appeals, and that courts tend to accommodate governmental power, its policy of litigating to the death must be taken as a substantial factor that obliterates illusions of quick, cheap resolution. After over four years of litigation, one-half of it is still at the interlocutory summary judgment stage; reversals will require fresh starts. The court finds the three-to-five year range to be conservative, and it will operate on a finding that the most likely duration of further litigation will be at least four years.

Finnerty's models provided the most accurate estimate of professional fees and expenses. He assumed a constant rate for the first two years, with a lesser rate for each succeeding one. His estimates included both the costs of the litigation and the effect that the continued litigation would have on the costs of running the estates. For a four-year period, his estimate for litigation costs was approximately $24 million. The size of that number is less surprising when its context is professional fees and expenses that to date have far exceeded it. The operating expenses per year were assumed to be $2.5 million, or $10 million for four years.

The parties assumed that the estates' assets would grow at a rate of 3% per year. On total assets of $407 million, the estates

should earn approximately $51 million in four years. Subtract the cost estimate of $34 million from the income estimate of $51 million, and the estates will net $17 million in the four year period. This figure assumes that no interim distributions are made, and that the 3% return on the estates' assets can be realized even though $88 million of those assets are currently non-cash.

## G. *Opportunity Cost.*

■■ The juniors strenuously argue for an economic framework that ignores the concept of opportunity cost. Their arguments have these two effects.

1. The practical effect of delaying distributions for further litigation is to make the seniors bear almost all of the cost and risk of the litigation while the juniors stand to benefit if the cases are successful.

2. The delay in the distributions to the senior claimants allows the estates to earn additional interest income on the funds it is holding, with the consequence that delay enhances the junior claimants because the earned funds will go to them since the seniors cannot accrue interest on their liquidated claim before a plan is confirmed.

In addition to the direct costs and risk of the litigation, the parties will bear an implicit, but very real, cost in the lost opportunity to employ their share of the estates' assets in alternative ventures. This opportunity cost recognizes the time value of money. A dollar next year is not as valuable as a dollar now.

Throughout the confirmation hearing, the principal focus was on the opportunity cost that the seniors would bear. The seniors' cost of capital is relevant because the seniors' claim is 86% of the assets of the estates. The seniors are for practical purposes the last class to be paid by the plan; therefore, the seniors' money would overwhelmingly be at risk of a judgment adverse to the debtors and the retention of their money through the four years of litigation carries a direct erosion of their capital.

The juniors' enthusiasm for continued litigation is explained by their having at risk a

total of about seven months' interest at three percent on the seniors' money, and while the seniors lose the interest during the wait, if the debtors lose in the end, the seniors will also lose their capital in the amount of an adverse judgment since it will first be paid out of their potential dividend. Yet the juniors stand to benefit by almost all of the favorable recovery. The juniors like the odds when they can gamble with the seniors' money. If, as was suggested in argument, this is Russian roulette, the juniors want to pull the trigger but to hold the revolver to the seniors' head.

Mellon estimated the opportunity cost at a discount rate of 13%, a conservative estimate of the return that could be expected from investments of similar risk and character. That rate makes sense. The juniors's chose a risk-free rate of 3%. They equate the risk and reward in the market of a bankruptcy claim whose value is dependent on litigation with a treasury bill. That is so implausible that it approaches the dishonest. In a time of 3% risk free returns, a return four times as high for bond claims in a four-year-old bankruptcy is facially reasonable, which is after all only twice the going rate for solid corporate bonds. For caution, the court will use 12% in its calculations.

Applying a 12% discount rate to the $354 million claim over four years, the opportunity cost to the seniors is $169.9 million.

### H. *The Net Present Value of the FDIC Litigation.*

The economic value of a venture is the magnitude of the outcomes, less the cost, multiplied by the likelihood of their occurring; $E(X) = P(V - C)$. The outcome of a judgment for $19 million is worth $9.5 million after it is multiplied by the probability that it will indeed occur of 50%. The income to the estate during the litigation, mainly from interest earnings, after subtracting the direct costs, is a positive $17 million, which, when added to the $9.5 million recovery value, leaves the estate with a gain of $26.5 million. That apparent income has been achieved at an opportunity cost of $169.9 million. The net present value of the FDIC litigation is a *negative* $143.4 million. The settlement is

not only fair and equitable, but it is mandated by economic reality, general legal principles, and the bankruptcy code.

This huge disparity between the benefits of the litigation to the estate versus the costs demonstrates that the several variables can be changed by any amount within reason without making the settlement legally or economically unattractive. No one wins by litigating. If the correct discount rate were the risk-free rate of 3%, the cost would still exceed the benefits by $16 million, and you would settle. If the litigation took only three years, you would settle. Most important, if the recovery from the FDIC litigation was far greater, you would still settle.

Of all the hypothetical situations presented in the evidence, the most favorable ones were those by Cole that showed significant distributions to the juniors through a large recovery against the FDIC. This result was fueled by Cole's assumption, via Hagans, of a *certain* recovery from the FDIC of $60 million. Because Hagans testified of an expected value of $61 million that was merely more probable than not, the value of $61 million represents an actual recovery of $122 million, discounted for its likelihood.

Even with that large a recovery, which this court finds to be wholly implausible, only three of Cole's nine arrangements produced a net present value of the distribution to the creditors at the end of the litigation that was greater than the net present value of the plans that incorporate the settlement. If one assumes, as did the juniors' expert, that the litigation would be concluded with three years' delay, with spectacular success, with opportunity costs at 3%, and with fees and expenses of $5 million, the difference between the plans and these assumptions favors the assumptions by a mere $3.5 million. That is a difference of less than one percent of the net asset value of the estates as they stand today.

The juniors' alternatives do not increase the value of the estate. The whole effect of their alternative strategies is to change the distribution rather than to increase the distributable mass. The juniors' proposals are allocative, not productive; they merely move

money from the seniors to the juniors through the erosion of opportunity costs of those creditors who have priority over the juniors. Rather than impose this indirect cost for the sake of potentially increasing the juniors' recovery by $128 million, which is the result of the juniors position, the court could give the juniors what they expect from the litigation, pay the FDIC its bounty, and save the administrative time and expense by simply paying these amounts out of the seniors' claim right now; the result of these direct changes would be $42 million less to the seniors than the gamble on the litigation. The juniors' expert conceded this point.

## I. *The Code & Interest.*

Noting that only secured creditors are guaranteed post-petition interest, the juniors urge that the code's requirement that interest not accrue on a debtor's unsecured obligations from the date of filing through the date of confirmation demonstrates the intent of congress that opportunity costs not be used to determine net present values for plan confirmations or for settlement approvals. *Cf.* 11 U.S.C. § 502(b)(2) (1988).

If the indenture that subordinates the juniors' notes clearly includes a right in the seniors' to post-petition interest, the law allows enforcement of the indenture allowing a payment of interest to the seniors before requiring a distribution to the juniors. *See, e.g., In re Times Sales Finance Corp.*, 491 F.2d 841, 844 (3d Cir.1974). If the seniors are entitled to post-petition interest, the juniors are in a very deep hole, because the seniors have been accruing that interest for over four years. Assuming a rate of 10%, if the FDIC paid the debtors $140 million today, all the current cash and all that money would go to the seniors—the juniors would get nothing.

Post-petition interest is not opportunity cost. Opportunity cost is an economic concept that accounts for the cost to the owner of funds for the funds not being used in the next best reasonably available investment for the period of their use that is being compared. Not to consider opportunity cost would be to treat the capital as free. Capital has a value over time, whether the capital is

in the form of shareholders' equity or the seniors' bond principal. The juniors want to use the seniors' capital in a risky venture for four years without compensation or even consideration of the alternative earning power of that capital otherwise employed.

The path of the juniors' argument slips quickly into silliness. If opportunity cost is not to be taken into account, then the estates should sit on their $407 million in assets for as long as it takes for the interest to accrue to the point that *everybody* could be paid. By their logic, the code would prohibit liquidation until interest accrued on the estate's assets to pay everybody a distribution all the way down to equity.

## 8. *Confirmation of the Plans.*

Courts approve plans if they comply with the applicable provisions of the bankruptcy code, including good faith and disclosure requirements, acceptance requirements, and equal treatment and priority requirements. 11 U.S.C. § 1129(a) (1988). All of these requirements are met, except that each of the impaired classes in a plan did not vote to accept the plan. The juniors are an impaired class because under the plans the holders of that class of investment security will not have their claims fully paid. The juniors as a class voted to reject both the MCorp and MCorp Financial plans, and the equity classes have been presumed to reject the MCorp plan; therefore, the additional requirement must be met that the court evaluate the plans to ascertain that (a) there are sensible financial explanations for the treatment of the claims and assets and especially that (b) there was no impermissible collusion between other claimants, trustees, or debtors to the injury of the impaired class. 11 U.S.C. §§ 1129(a)(8) & 1129(b) (1988).

## A. *Forced Acceptance.*

The code allows approval of the plan despite the objections of the impaired class if "the plan does not discriminate unfairly [against the rejecting class], and is fair and equitable" to the rejecting class. 11 U.S.C. § 1129(b)(1) (1988). When the objecting class consists of unsecured claims, to meet the fair-and-equitable standard the plan must

not allow distributions to the holders of claims inferior (junior) to the claims of the impaired class. 11 U.S.C. § 1129(b)(2)(B)(ii) (1988). No class of claims inferior to the subordinated bondholders will receive anything. These plans are in the nature of straight liquidations; this means that the proceeds of the assets are being distributed in order of the classes' priority under the code. The plan gives nothing to the classes below the subordinated bondholders, so this provision is met. Indeed, the facts are palpable that the cooperative astuteness of a class of claimants with priority over the subordinated bondholders is yielding part of its claim to produce a settlement that leaves the juniors with the prospect of receiving at least some value for their claims.

■ To overcome the objections of an impaired class, the proponents of a plan must establish the facts that legitimate the impairment by a preponderance of the evidence. *See Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd.*, 994 F.2d 1160, 1165 (5th Cir.1993).

The requirement that a plan not discriminate unfairly preserves just treatment of a dissenting class from that class's own perspective. No class can be selected involuntarily for sacrifice to the benefit of everyone else. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 416–17 (1977), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 6372, 6373. The plan must allocate value to the dissenting class consistent with the value allowed other classes with similar legal claims. *See In re Sandy Ridge Dev. Corp.*, 889 F.2d 663 (5th Cir.1989). The classes of equity are totally impaired, and they will be under any conceivable arrangement.

■ The juniors argue that, because they are not subordinate to the FDIC, the FDIC's receiving anything before the juniors are paid in full violates the code. The court does not have to decide the priority because even if you assume the FDIC is inferior to the juniors the FDIC is paid by the seniors out of their higher-priority share. The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive as least as much as what they would without the sharing. For instance, a secured creditor could share its proceeds with unsecured creditors whose priority came behind that of the IRS. *Cf. In re SPM Mfr. Corp.*, 984 F.2d 1305, 1312 (1st Cir.1993). That the creditor was secured is not relevant; it was the creditor's status as prior to the IRS that allowed it to share with those under the IRS, just as the seniors' priority over the juniors allows them to fund the FDIC settlement.

The juniors lent the debtors money in exchange for bonds. When the debtors' financial position weakened to the point that repayment was doubtful, the holders of those bonds agreed that their claims would be lower in priority to those of the new lenders to induce the new lenders to make loans to the precarious borrowers. Now that the venture failed, the legal rights of the holders of those subordinated bonds remain beneath the senior bondholders. The seniors are senior because the juniors agreed to be junior. No manipulation of corporate shells, no gerrymandering of classes, created the position of the juniors as next to last in line for assets. The impaired class does not like the consequence of its having agreed to be the penultimate recipient of asset distributions, but the class is being treated by the plan in a fashion consistent with all other classes, with their contract, and with the law. The subordinated bonds will be paid the assets that exceed the claims prior to theirs, and they will be paid their claims before equity is paid. All equity is treated alike. The plans survive under the statutory test.

### B. Best Interests of the Creditors.

Principal Mutual, Shearson, the juniors, and Chemical Bank, as the juniors' indenture trustee, all object to the plans on their claim that the plans allow nonconsenting members of an impaired class to receive less than they would under a plain liquidation. *See* 11 U.S.C. § 1129(a)(7) (1988).

To the extent that these objections are based on quarrels with the valuations of the non-cash assets, Ernst & Young's recovery valuations under the plans are higher than the liquidation evaluations in every instance.

The court has already found those evaluations to be reasonable and adopted them.

The juniors claim that Ernst & Young's liquidation values are not credible because it reduces the value of the non-cash assets to 74% of their value under the plans. Are the circumstances of a three-estate liquidation sufficiently different from the liquidation under the plans to justify a 26% reduction in the value that the estates can reasonably expect to receive? Yes.

Peter Bartholow is the proposed liquidating trustee for the plans, and he is uniquely familiar with the assets and the related problems. Bartholow will not serve as a chapter 7 trustee. The additional costs of three chapter 7 trustees, the short time allowed a plain liquidation, the potential for more claims to be filed against the estates, and the loss of knowledge and momentum that Bartholow has about the management of these assets would combine to reduce significantly the cash to be realized by the estates from these assets. The lower prices from the liquidation are reasonable.

The best interests of the creditors are only marginally affected. The non-cash assets are the remaining properties in the estates other than cash and things readily convertible to cash; they include land in downtown Houston and several other locations, an art collection, cars, the AmeriTrust note, corporate shells, and Plaza Bank, among many odds and ends.

The plans value the non-cash assets at $88 million, and the testimony placed their liquidation value at only $65 million. If this $23 million difference in valuation is accurate, the total cash that will be ultimately available to the Seniors under a liquidation would be $308 million, $11 million less than their $319 million cap on their claim of $354 million. This shortage would have to be made up before the Juniors receive a distribution. Since the Juniors receive $6 million under the plans, the first $17 million of undervaluation would only benefit the seniors. If it were established that the liquidation values should have been reduced by only $8 million, rather than $23 million, then the juniors still do worse in the liquidation, because $11 million of the extra $15 million would go to the seniors,

leaving the juniors with $4 million, less than they receive under the plans.

If the difference between an orderly, cooperative sale under the plan and a forced sale under a plain liquidation is only a loss in value of 7%, the juniors do about as well under the liquidation as they do under the plans. The highly probable effect of shifting from the debtors' managing the assets under the plan to a trustees' liquidation is a loss in the value to the estates from the non-cash assets of at least 10%. The 26% loss found by Ernst & Young is reasonably likely to occur. A class that gets nothing under the plans will get nothing under a plain liquidation. If impairment of the juniors is partial under the plans, it is likely to be greater under the plain liquidation.

To the extent that the objections go to the settlement, under a liquidation the liquidating trustee would have to make an analysis whether to settle or to pursue the litigation similar to the one that the proponents established in court; however, because the court has approved of the settlement, the settlement would remain to affect a liquidation. These creditors would get no more from a liquidation than they do under the plans.

### C. *Good Faith Test.*

 Several creditors have brought two types of objections to the plans because they say that the plans are not being proposed in good faith. These creditors are the juniors, Shearson, Chemical, and Plaza Bank. A plan must be proposed in good faith, and the faith of the proposal is ascertained from the objective consequences of the plan, not the moral consciousness of the various proponents. 11 U.S.C. § 1129(a)(3) (1988); See In re Andreuccetti, 975 F.2d 413, 420 (7th Cir. 1992). The first objection is from the subjective category of bad faith arguments; the juniors claim that the debtors have "switched sides" for no apparent reason and that the debtors' arguments last fall against a settlement demonstrate a lack of good faith. This position is a transparent quibble, as already demonstrated. If anyone in this litigation has demonstrated a capacity for alliances of convenience, it is the juniors.

The second objection involves the saga of Plaza Bank, a distressing story. Plaza Bank is the last bank owned by the debtors. The FDIC settlement contemplates that the debtors will abandon Plaza Bank's litigation against the FDIC. The plans have MCorp Financial deposit its 100% interest in Plaza Bank in a trust. The trustee will be instructed to cause the bank's action against the FDIC to be dismissed. In the lawsuit, Plaza claims the FDIC owes it for $17 million for federal funds that Plaza loaned MBank Dallas the day before the seizure; the bank has an interlocutory summary judgment that includes interest. Plaza has been allowed to carry the judgment on its books at face value. Plaza contends that without those funds, it will be insolvent. From the evidence at the confirmation hearings, Plaza is insolvent even with those funds, and its only hope are further regulatory forbearance and reorganization.

More to the point, Plaza has no standing to object. A wholly-owned subsidiary of a debtor is not by that relation a creditor. The debt that concerns Plaza Bank is one it is owed by MBank Dallas, an extinct former wholly-owned subsidiary of a debtor. Despite a lot of maudlin talk about corporate constituencies, MCorp Financial owns the bank, allowing it to do what it wants with it within the law. The current directors and officers owe a fiduciary duty to the owners as a whole, and in this instance that is one entity. It is irrelevant that an incorporeal chattel does not like its owner's attitude. Even if Plaza had standing to object, the lack of good faith according to Plaza Bank is found in the debtors' sacrificing the last bank subsidiary for the benefit of their long-waiting creditors. The choice of peace with the FDIC over the potential viability, not vitality, of Plaza Bank is neither evil nor even suspect. The entire region participated in the boom, and the unhappy consequences of its collapse fall unevenly, but generally, over the region. Plaza Bank is a sad but unremarkable instance of the fiscal and regulatory policies that fostered both boom and bust. All of the objections of Plaza will be denied.

### D. *Other Requirements of the Code.*

The plans must comply with all other requirements of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1) (1988).

#### (1) *Contingent Claims Reserve.*

Principal Mutual and the insurers object to the plan because the contingent claims reserve does not contain the full pro-rata amounts each creditor claims until a final, non-appealable order has been entered. *See supra* § 4.B.2. These two creditors have senior claims, and the plans reserve only the pro-rata share of the value of the claim as estimated by the court. They urge that this result violates the Code because it could result in these claimants getting less than their pro-rata share if their claims are ultimately awarded in an amount greater than the estimate, leaving them treated worse than similar senior claims. *See* 11 U.S.C. § 1123(a)(4) (1988).

If Principal Mutual or the insurers are eventually allowed claims on appeal greater than the amount reserved for them in the contingent claims reserve, and if there is no money left to pay those claims, they will not receive the same pro-rata share that the other senior claimants did. Principal Mutual also objects to post-confirmation interest being earned by other senior claimants because it would not earn interest on the part of its claim that has been disallowed and may be later resurrected, at least until resurrection.

A contingent claim is entitled to a reserve for its full amount. *See, e.g., In re ARN LTD. Limited Partnership*, 140 B.R. 5, 13 (Bankr.D.D.C.1992). Claims come in four varieties: liquidated/non-contingent, nonliquidated/non-contingent, liquidated/contingent, and non-liquidated/contingent. A contingent claim does not remain at its original pleaded value until a final, non-appealable order is entered. Once an adjudication at the trial level has been made, the claim is no longer contingent; it is allowed to some extent or disallowed. To hold otherwise would mean that no bankruptcy estate could ever make a distribution without every disputed claim, no matter how frivolous or how unseasonably brought, having been fully litigated through the trial court and three appellate

levels. This is not the system that congress created. Treating adjudicated disallowed claims equal to adjudicated or agreed fixed claims would be the irrational treating of dissimilar things similarly. Adjudicated contingent claims are entitled only to have a reserve for their pro-rata share of the adjudicated amount.

■ These creditors also complain that the funding of the contingent claims reserve will rely to a significant degree on non-cash assets. Their argument is *if* the non-cash assets are overvalued, no cash will remain in the estates to replenish the reserve. The plans provide for replenishment if the non-cash assets liquidate at a less-than expected value. The estimation of those assets has been found to be as accurate as is to be reasonably expected. These creditors have no right to a reserve funded solely of cash assets.

## (2) *Administrative Claims Reserve.*

The court will establish an administrative claims reserve of $24.6 million. Chemical Bank and Shearson object that their claims for attorney's fees are not included in the reserve. The court has yet to rule on those claims, but the record suggests serious doubts about their merits. Additionally, these claims are small enough that if they are allowed by the bankruptcy court, the estates will have sufficient funds to pay them after the initial distributions.

Principal Mutual objects to the treatment of its recently-filed $16 million administrative claim. This claim duplicates the claim in another MCorp-related case before this court. The case is about the transfer of assets to the debtors from MCorp Properties, a wholly-owned non-debtor subsidiary of a debtor.

Principal Mutual may become a creditor of Properties, but only if this court finds that it can enforce a sub-lease against Properties, which was a co-tenant with MCorp in one of the buildings in the complex that formerly served as MCorp's headquarters. The amount of the claim is highly speculative and extremely contingent. Principal Mutual does not have standing to assert an administrative claim based on a fraudulent transfer from an entity of which it is not yet even a creditor. On a technical point, further, the transfers were approved by the bankruptcy court, and Principal Mutual failed to object. *Cf. Port O'Call Inv. Co. v. Blair,* 538 F.2d 849, 851 (9th Cir.1976) (*per curiam*). The recent addition of this claim shows that Principal Mutual is not content with putting sand in the gears—it wants to throw in an occasional wrench. This claim has no substance; it is a secondary claim, the claim against another non-bankrupt company. At best Principal Mutual is a creditor of a creditor of a debtor. It will not be allowed.

### (3) *Injunction.*

■ Principal Mutual objects to the plans because of provisions that bar the filing of further claims against the estates. *See* 11 U.S.C. §§ 524 & 1141(d)(3) (1988). The proponents argue that these measures are necessary for an orderly liquidation of the estates. *See* 11 U.S.C. § 1123(a)(5) (1988).

After over four years of notorious, multi-stage litigation, all claims of every type should have been brought. It is difficult to imagine a valid future claim against these estates. The injunctive provisions, however, are narrowly tailored to pre-petition and administrative claims. *See* ¶ 13.10 MCorp Plan. The discharge statutes have not been violated.

### (4) *Post–Confirmation Interest.*

The plans provide for post-confirmation interest on the seniors' claims at a rate of four percent. The seniors argue that a drafting mistake was made, and the rate should be seven percent. A plan proponent does not need leave of the court to modify a plan before confirmation. *In re One Canadaigua Properties, Inc.,* 140 B.R. 616 (Bankr. W.D.N.Y.1992). Since the creditors that oppose the higher rate already voted against the plan, the change is not material in the bankruptcy process itself. *See In re American Solar King Corp.,* 90 B.R. 808, 824 (Bankr.W.D.Tex.1988). The discussion of the economics of the plans, however, has assumed the lower rate, and the court has no desire to add to the complexity of this case. The post-confirmation interest rate will remain at four percent.

#### (5) *Shearson.*

Finally, Shearson objects to its different treatment. It is a creditor of MCorp only. *See supra* § 3.B.1. Because these plans are not substantively consolidated, there is a possibility that the juniors may be fully paid from assets of MCorp Financial before Shearson is fully paid from the assets of MCorp. Once again, the creditor with a particular characteristic wants to be treated as well as other creditors without that limitation. The process of liquidation can be conducted to eliminate this objection to a possibility. The objection will be denied.

#### 9. *Conclusion.*

This "proceeding" has become a spectacle of expensive litigation. Errors in judgment were made by honest bankers trying to build a complex business in the midst of mistaken fiscal and regulatory policy. The bankers' ability to work their way out of the potential losses was destroyed by a sudden regional economic decline. The existing losses and consequent disruptions were compounded by an arrogant and inept intrusion of the government. Into the debris rushed litigious rascals, whose idea of the public administration of civil justice is a cross between a poker game and the battle of the Somme. As is usually the case, the quiet, competent, cooperative actions of the great many are obscured by those few others.

After the complexities of the MCorp empire have been seized, partitioned, valued, claimed, analyzed, and marshalled, the second set of plans that has been proposed addresses the legal technicalities and the economic realities reasonably and fairly. It will be approved. In the process of adjudicating the issues raised during the slow trip to this point, the court has had to examine the holding company's predecessor's tax returns for years as early as 1968, pension plans originating in the 1950s, office building maintenance costs in Dallas, distinctions between the FDIC corporate and FDIC receiver, economies of scale in trust department operations, data processing systems development, among others.

The plans for ending the litigation, liquidating the assets, and distributing the funds are as reasonable a solution to this historic problem as is plausible. The plans accord with the expectations of the statutes and the constraints of equity.